[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 738 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 739 
The appellant, George Martin, was convicted of murder made capital because it was committed for pecuniary gain. See §13A-5-40(a)(7), Ala. Code 1975. Specifically, the jury found that Martin, a former Alabama State Trooper, killed his wife, Hammoleketh Jackson Martin, in order to collect approximately $377,000 of life insurance proceeds from a number of policies. The jury, by a vote of 8-4, recommended that Martin be sentenced to life imprisonment without the possibility of parole. However, the trial court overrode the jury's recommendation and sentenced Martin to death.
Martin does not challenge the sufficiency of the State's evidence presented in support of his conviction. However, because this case involves the imposition of the death penalty, we have reviewed the evidence, and we find that it is sufficient to support Martin's conviction for capital murder. Nevertheless, a summary of the crime and Martin's participation therein is in order. We quote from the trial court's written findings of fact, taken from its sentencing order:
 "On October 8, 1995, officers of the Mobile Police Department and firefighters from the Mobile Fire Department were called to the scene of a vehicle fire *Page 740 
in the vicinity of Willis Road and Highway 90 in an isolated area of South Mobile County. They arrived on the scene at approximately 11:30 p.m.
 "Upon arriving at the scene, police and firefighters observed a 1991 Ford Escort burning and viewed what appeared to be charred human remains inside the vehicle. The medical examiner was summoned and testified that he observed the head of the victim lying on the driver's side and the rest of the remains situated on the right front seat. Due to the immense heat from the still smoldering vehicle and the absence of light, the remains were not removed until the following morning. The medical examiner testified that parts of the body were not intact. Both arms and shoulders had virtually fallen off the torso, and so the remains had to be removed in pieces. At autopsy, these remains weighed only approximately 24 pounds. The manner of death was determined to be homicide; the cause of death was determined to be body burns (100%) and smoke inhalation. Moreover, the victim was alive at the time the fire started in the car.
 "The investigation revealed that the fire was intentionally set. According to the evidence, the fire started in the right rear passenger compartment and spread forward. The minimal damage to the front of the vehicle precluded any conclusion that the impact of the car with a tree in the area could have started the fire; rather, the evidence was uncontroverted that the scene was consistent with a staged wreck.
 "A traffic homicide investigator from the Alabama Department of Public Safety testified that he examined the vehicle and the scene in question. He conducted speed calculations of a vehicle and analyzed the kind of force that would have been necessary to cause such a fire. He concluded that the fire was not an accident and the collision of the vehicle with a tree did not produce sufficient force to start the fire.
 "[Martin], when initially notified by officers of the Mobile Police Department that his car had been found with a body in it stated that he had last seen his wife at approximately 8:00 or 8:30 p.m. that evening. He stated she left the house without telling him where she was going and that he fell asleep watching a football game on television. He initially stated that he had awakened at approximately 1:00 or 1:30 in the morning and, after noticing that his wife was not home, decided to go look for her.
 "[The State] introduced evidence of several inconsistencies in [Martin's] various statements. Among the inconsistencies, were the time that he awoke to discover his wife missing, that the victim carried a gasoline can in her automobile with her because the gas gauge did not work, and that a BIC lighter found at the scene was used by his wife, the victim, as a flashlight because the dome light in her car did not work. The evidence also established that the defendant was less than honest when questioned about the existence of life insurance policies insuring the life of his wife, Hammoleketh Martin. Though the defendant acknowledged the existence of a policy insuring his wife's life for $200,000, he lied when he stated there were no other policies. In particular, another policy insuring the life of Hammoleketh Martin for $150,000 was introduced into evidence and, according to the State's evidence, this amount was collectible only if Hammoleketh Martin *Page 741 
died in a passenger vehicle.[1]
 "The State also introduced evidence of a Traffic Accident Investigation Report prepared by [Martin] approximately one year prior to the death of his wife. The report involved a traffic accident in which an automobile left the road, hit a tree, and burst into flames. The State contended that the report of his incident, which was the defendant's version of what occurred, was strikingly similar to the occurrences of one year prior.
 "The State linked the evidence of the insurance proceeds with the purported financial difficulties of the defendant. According to the prosecution's testimony, [Martin's] financial condition had deteriorated to the point where he was approaching bankruptcy."
(C. 125-26.)
Martin resigned his position as a state trooper in 1996 and later moved to Texas. However, the police continued to investigate the incident. In 1999, the police arrested Martin and charged him with murder made capital because it was committed for pecuniary gain. Martin was extradited to Alabama to stand trial. While incarcerated and awaiting trial, Martin told another inmate that he had killed the victim.
 Standard of Review
In every case where the death penalty is imposed, this Court must review the record for any plain error, i.e., for any defect in the proceedings, whether or not the defect was brought to the attention of the trial court. Rule 45A, Ala.R.App.P., provides:
 "In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
As this Court stated in Hall v. State, 820 So.2d 113, 121-22
(Ala.Crim.App. 1999), aff'd, 820 So.2d 152 (Ala. 2001), cert. denied, 535 U.S. 1080, 122 S.Ct. 1966, 152 L.Ed.2d 1025 (2002):
 "The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal. As the United States Supreme Court stated in United States v. Young, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1
(1985), the plain-error doctrine applies only if the error is `particularly egregious' and if it `seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.' See Ex parte Price, 725 So.2d 1063 (Ala. 1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999); Burgess v. State, 723 So.2d 742
(Ala.Cr.App. 1997), aff'd, 723 So.2d 770 (Ala. 1998), cert. denied, 526 U.S. 1052, 119 S.Ct. 1360, 143 L.Ed.2d 521 (1999); Johnson v. State, 620 So.2d 679, 701 (Ala.Cr.App. 1992), rev'd on other grounds, 620 So.2d 709 (Ala. 1993), on remand, 620 So.2d 714
(Ala.Cr.App.), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993)."
Although Martin's failure to object at trial will not preclude this Court's review of an issue in this case, it will, nevertheless, weigh against any claim of prejudice he makes on appeal. See Dill v. State, 600 So.2d 343 (Ala.Crim.App. 1991), *Page 742 
aff'd, 600 So.2d 372 (Ala. 1992), cert. denied, 507 U.S. 924,113 S.Ct. 1293, 122 L.Ed.2d 684 (1993).
A number of the issues Martin raises on appeal were not first brought to the trial court's attention. Accordingly, this Court's review of those matters is limited to the application of the plain-error doctrine.
 Guilt-Phase Issues I.
Martin argues that the trial court erred in allowing Pamela Carey, a friend of the victim's, to testify about a conversation between her and the victim that took place a few days before the victim's death. Carey testified that a few days before the victim's death, the victim appeared troubled, and she expressed concerns about Martin's behavior. She gave Carey her mother's name and telephone number and told Carey that if she did not hear from her in three or four days or if she heard something about her being missing, to telephone her parents and tell them "he did it." (R. 1244.) The victim's comments upset Carey, and she told the victim, "don't say that." According to Carey, the victim then said, "[H]e might not do it, he loves me, George loves me." (R. 1242-45.)
Specifically, Martin argues that allowing Carey to testify regarding her conversation with the victim violated the hearsay rule. He cites as authority for this convention this Court's decisions in Hargrove v. State, 368 So.2d 335, 337
(Ala.Crim.App. 1979) ("Statements and declarations of a deceased are not competent evidence for or against an accused in a murder prosecution unless made in his presence, or unless they are admitted in evidence as part of the res gestae or constitute dying declarations."), and Freeman v. State, 505 So.2d 1079,1085 (Ala.Crim.App. 1986) (same). Initially, we note that those cases were decided before the adoption of the Alabama Rules of Evidence. Moreover, in subsequent decisions, the Alabama Supreme Court appeared to expand this rule, stating: "Statements by a homicide victim . . . are inadmissible unless the statements are made in the presence and hearing of the accused or fall within some other exception to the hearsay rule." Ex parte Bryars,456 So.2d 1136, 1139 (Ala. 1984). Accord Cheriogotis v. State,555 So.2d 1147, 1153 (Ala.Crim.App. 1989).
Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Rule 801(c), Ala.R.Evid.
 "`A statement made out of court is not hearsay if it is given in evidence for the purpose merely of proving that the statement was made, provided that purpose be otherwise relevant in the case at trial. 5 Wigmore, Evidence, § 1361; 6 Ibid., § 1770; Motors Ins. Corp. v. Lopez, 217 Ark. 203, 229 S.W.2d 228
(1950).' Bryant v. Moss, 295 Ala. 339, 329 So.2d 538, 541 (Ala. 1976)."
Wilson v. State, 571 So.2d 1237, 1241 (Ala.Crim.App. 1989), rev'd on other grounds, 571 So.2d 1251 (Ala. 1990).
A statement that constitutes hearsay may still be admissible under one of the exceptions to the hearsay rule. One such exception is the "state-of-mind" exception, as set out in Rule 803(3), Ala.R.Evid. Alabama courts have long recognized that a statement by the declarant concerning then existing emotions or state of mind is admissible as an exception to the rule against hearsay. See Charles W. Gamble, McElroy's Alabama Evidence § 261.03(2) and (5) (5th ed. 1996). Both this Court and the Alabama Supreme Court have recognized that a statement demonstrating the declarant's fear is admissible under the state-of-mind exception. See Ex parte Dunaway, 746 So.2d 1042, 1048 (Ala. 1999) *Page 743 
(witness's testimony concerning victim's statement of fear admissible), cert. denied, 529 U.S. 1089, 120 S.Ct. 1724,146 L.Ed.2d 645 (2000); Ex parte Whisenhant, 555 So.2d 235 (Ala. 1989) (statement of fear, including statement as to the cause of the fear, held to be admissible), cert. denied, 496 U.S. 943,110 S.Ct. 3230, 110 L.Ed.2d 676 (1990); Jackson v. State,629 So.2d 748 (Ala.Crim.App. 1993) (same).
Here, Martin had attempted to establish that he and the victim had had a good marital relationship. The State, however, offered the victim's statement to Carey as evidence that the couple's relationship was not as Martin had portrayed it during the investigation. Rather, the victim's statement to Carey demonstrated her state of mind at the time of the conversation; namely, that she was fearful that Martin was about to harm her.
"The question of admissibility of evidence is generally left to the discretion of the trial court, and the trial court's determination on that question will not be reversed except upon a clear showing of abuse of discretion." Ex parte Loggins,771 So.2d 1093, 1103 (Ala. 2000). Because Carey's testimony concerned the victim's state of mind, the trial court's admission of this testimony was not error.
 II.
Martin next argues that the trial court erred in denying his request for a continuance. Specifically, Martin argues that he should have been allowed time to have various items of evidence tested by an independent expert witness. Alternatively, Martin argues that the trial court should have granted a continuance because of an alleged Brady[2] violation.
Martin's trial was set to begin on May 1, 2000. On April 27, 2000, Martin filed a motion for a continuance, based on the ground that there was a possibility that some of the evidence the State intended to offer at trial had been cross-contaminated by other evidence. Martin sought a continuance so that he could obtain an expert to determine whether the evidence had, in fact, been cross-contaminated.
It is well settled that a motion for a continuance is addressed to the sound discretion of the trial court and that, absent a showing of abuse of that discretion, the trial court's decision on such a motion will not be overturned on appeal. See, e.g.,Smith v. State, 797 So.2d 503, 523 (Ala.Crim.App. 2000), cert. denied, 797 So.2d 549 (Ala. 2001), cert. denied, 534 U.S. 962,122 S.Ct. 371, 151 L.Ed.2d 282 (2001); Arthur v. State,711 So.2d 1031, 1069 (Ala.Crim.App. 1996), aff'd, 711 So.2d 1097
(Ala. 1997).
Martin argues that the trial court abused its discretion because, he says, he had a right to independent testing of his clothing, so that he could cross-examine the State's witnesses regarding whether the clothing could have been cross-contaminated by other evidence. "`The purpose of allowing an accused to obtain an additional test is to provide him a means of "cross checking" the State's test.'" Ex parte Harwell, 639 So.2d 1335, 1338
(Ala. 1993) (quoting Gibson v. City of Troy, 481 So.2d 463, 467
(Ala.Crim.App. 1985)).
Here, Mobile police officers went to Martin's home the morning after the victim's death and seized the clothing Martin was wearing on the night of the victim's death. Also seized were old newspapers that smelled of gasoline. Mobile police Cpl. Don Pears placed Martin's clothing in a paper bag; he placed the newspapers in a separate bag. Both bags were then *Page 744 
placed in the trunk of his patrol car; however, the bags did not touch each other. The following morning the two bags were delivered to the Department of Forensic Sciences for testing. All of the items tested positive for the presence of gasoline and/or petroleum residue. Scott Milroy, a forensic examiner with the State Department of Forensic Sciences testified that the items seized by Cpl. Pears had been improperly stored and that the evidence may have been cross-contaminated. However, he testified that there was no method of testing to determine whether the items tested positive for the presence of gasoline and/or petroleum residue because they had been cross-contaminated. Thus, no purpose would have been served by granting a continuance for additional testing. Accordingly, the trial court did not abuse its discretion by denying Martin's motion for continuance.
Martin also contends that the trial court should have granted a continuance based on an alleged Brady violation. Specifically, Martin argues that the State failed to disclose exculpatory evidence; namely, that the evidence may have been cross-contaminated.
 "To establish a Brady violation, a defendant must show that (1) the prosecution suppressed evidence, (2) the evidence suppressed was favorable to the defendant or was exculpatory, and (3) the evidence suppressed was material to the issues at trial. Ex parte Kennedy, 472 So.2d 1106 (Ala. 1985), cert. denied, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325
(1985). `Materiality' requires a finding that, had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different."
Coral v. State, 628 So.2d 954, 979 (Ala.Crim.App. 1992), aff'd, 628 So.2d 1004 (Ala. 1993), cert. denied, 511 U.S. 1012,114 S.Ct. 1387, 128 L.Ed.2d 61 (1994). This Court has held that where the prosecutor has allowed open-file discovery, "`[t]here is no Brady violation where the information in question could have been obtained by the defense through its own efforts.'"Freeman v. State, 722 So.2d 806, 810-11 (Ala.Crim.App. 1998) (quoting Johnson v. State, 612 So.2d 1288, 1294 (Ala.Crim.App. 1992)). Accord Ward v. State, 814 So.2d 899, 919 (Ala.Crim.App. 2000), cert. denied, 814 So.2d 925 (Ala. 2001), cert. denied,535 U.S. 907, 122 S.Ct. 1208, 152 L.Ed.2d 145 (2002).
Because this was a capital-murder case, the trial court ordered that the State open its files to the defense as part of discovery. Contained in the State's file was information concerning how the evidence was collected and stored. Thus, the State suppressed no evidence. Moreover, when interviewed by Martin's attorneys, police officers involved in collecting the clothing made no secret that the clothing had been improperly collected. Further, as previously noted, forensic scientist Scott Milroy readily acknowledged on cross-examination the possibility that the evidence had been cross-contaminated, based on the fact that it had been improperly collected and stored. Further, Martin has failed to show that had a continuance been granted, the outcome of the trial would have been different. Given these circumstances, we conclude that no Brady violation occurred. Thus, the trial court did not abuse its discretion in denying Martin's motion for a continuance.
 III.
Martin argues that the trial court erred in denying his motion to suppress evidence seized from a footlocker he kept in the trunk of his patrol vehicle. Specifically, Martin argues that the search of the footlocker was illegal and, alternatively, the *Page 745 
accident report found in the locker was not relevant as evidence in his trial for the murder of his wife.
 A.
Martin first argues that his footlocker was illegally searched because, he says, he had an expectation of privacy in the footlocker and police investigators lacked probable cause to search the footlocker.
 "When a motion to suppress evidence in a criminal case states as a ground that the evidence was obtained in violation of the Fourth Amendment, one issue is whether the movant has standing to assert the claim and to seek to exclude the evidence. See 5 W. LaFave, Search and Seizure, § 11.3 (3d ed. 1996). The rights afforded protection by the Fourth Amendment are personal rights. See Simmons v. United States, 390 U.S. 377, 389, 88 S.Ct. 967, 973-74, 19 L.Ed.2d 1247 (1968). To have standing to object to a search, the objecting party must have a present possessory interest in the premises searched. Rakas v. Illinois, 439 U.S. 128, 133-34, 99 S.Ct. 421, 425, 58 L.Ed.2d 387 (1978). A party will not prevail if it appears that he or she had abandoned the premises before the objected — to search. See 5 LaFave, Search and Seizure § 11.3(a); Abel v. United States, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668
(1960) (defendant could not object to a search of a hotel room that he had vacated before the search). However, the inquiry does not stop there. The `"capacity to claim the protection of the [Fourth] Amendment depends not upon a property right in the invaded place but upon whether the area was one in which there was a reasonable expectation of freedom from governmental intrusion."' Mancusi v. DeForte, 392 U.S. 364, 368, 88 S.Ct. 2120, 2124, 20 L.Ed.2d 1154 (1968), quoting Katz v. United States, 389 U.S. 347, 352, 88 S.Ct. 507, 511-12, 19 L.Ed.2d 576
(1967)."
Neal v. State, 731 So.2d 609, 614-15 (Ala.Crim.App. 1997), aff'd, 731 So.2d 621 (Ala.), cert. denied, 527 U.S. 1027,119 S.Ct. 2377, 144 L.Ed.2d 780 (1999).
We find that Martin had no expectation of privacy in the footlocker in which the accident report was found. The evidence indicated that Martin kept the footlocker unlocked in the patrol car issued to him during his employment as a state trooper. Martin used the footlocker to store paperwork, reports, and other miscellaneous items. However, when Martin resigned his commission as a state trooper in February 1996, he left the footlocker and its contents in the patrol vehicle he returned to the Mobile State Trooper post. Martin made no move to claim the footlocker. He subsequently moved to Texas, leaving the footlocker behind. Approximately one year later, Mobile police Captain Michael Roland went to the Mobile State Trooper post and seized the unlocked footlocker. "`"When individuals voluntarily abandon property, they forfeit any expectation of privacy in it that they might have had."'" Thompson v. State, 680 So.2d 1014, 1016
(Ala.Crim.App. 1996) (quoting Carlisle v. State, 533 So.2d 645,647 (Ala.Crim.App. 1987), quoting in turn United States v.Jones, 707 F.2d 1169, 1172 (10th Cir.), cert. denied,464 U.S. 859, 104 S.Ct. 184, 78 L.Ed.2d 163 (1983)). Based on the foregoing, we conclude that Martin did not have a legitimate expectation of privacy in the footlocker. Therefore, he lacks standing to challenge its search by police investigators.
 B.
Alternatively, Martin argues that the trial court erred in admitting into evidence *Page 746 
the accident report found in his footlocker. He contends that the report was not relevant to the proceedings and that it was without probative value.
Rule 401, Ala.R.Evid., defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." See alsoSmith v. State, 745 So.2d 922, 929 (Ala.Crim.App. 1999). "In order to be admissible under Alabama law, evidence must merely have `any probative value, however slight, upon a matter in the case.'" Tankersley v. State, 724 So.2d 557, 562 (Ala.Crim.App. 1998) (quoting Charles W. Gamble, McElroy's Alabama Evidence § 21.01(1) (5th ed. 1996)).
The record indicates that during the search of Martin's abandoned footlocker, police investigators discovered a report detailing an accident Martin had investigated. The accident had occurred on October 8, 1994 — exactly one year before the victim's alleged accident. The report indicated that an accident had occurred when a vehicle had gone around a curve, left the road, hit something, and caught on fire, a scenario quite similar to what appeared to be the circumstances surrounding the victim's fiery death. Although a traffic homicide investigator determined otherwise, Martin continued to maintain that the victim's death was the result of a traffic accident — going so far as to provide implausible reasons why his wife's car could have caught fire, even though the impact was a low-speed one, which experts determined could not have caused the car to burst into flames. Indeed, Martin told investigators that because the gas gauge did not work, his wife had carried a can of gas in the backseat of her car; he also stated that he had seen her use a cigarette lighter while in the car to see by because the interior dome light was inoperable. Thus, Martin's theory of how his wife died was that she ran off the road and hit a tree, and, in the ensuing confusion, lit the cigarette lighter to see what had happened, causing the gasoline to ignite. The fact that Martin had investigated an automobile accident involving circumstances similar to those surrounding his wife's death one year later is probative. Because the accident report tends to shed light on whether Martin was guilty of capital murder in the death of his wife, the report is relevant, and the trial court did not abuse its discretion in receiving the report into evidence.
We also reject Martin's argument that Rule 403, Ala.R.Evid., bars admission of the accident report, because the probative value of the accident report is not substantially outweighed by the danger of unfair prejudice. Admittedly, all evidence offered against an opposing party is to some extent prejudicial. Otherwise, it would not be relevant evidence. See Acklin v.State, 790 So.2d 975, 998 (Ala.Crim.App. 2000) (quoting Fisherv. State, 665 So.2d 1014, 1019 (Ala.Crim.App. 1995)), cert. denied, 790 So.2d 1012 (Ala.), cert. denied, 533 U.S. 936,121 S.Ct. 2565, 150 L.Ed.2d 729 (2001). In order to be inadmissible, the evidence must do more than simply damage the opposing party's case. Dealto v. State, 677 So.2d 1236, 1238 (Ala.Crim.App. 1995). Because Martin has failed to establish exactly how he was substantially prejudiced by the admission of the accident report, no basis for reversal exists as to this claim.
 IV.
Martin next argues that the trial court erred when it allowed Barbara Jackson, the victim's mother, to testify about a feeling she had that something was happening to her daughter. Although this *Page 747 
issue was raised in Martin's motion for a new trial, Mrs. Jackson testified without objection. Thus, Martin's claim is reviewed under the plain-error standard. See Williams v. State,710 So.2d 1276, 1311 (Ala.Crim.App. 1996) (issues initially raised in a motion for a new trial that should have been raised during trial are reviewed on appeal only for plain error), aff'd,710 So.2d 1350 (Ala. 1997), cert. denied, 524 U.S. 929,118 S.Ct. 2325, 141 L.Ed.2d 699 (1998).
During its direct examination of Mrs. Jackson, the State asked her to tell the jury what she did after she got home from church on the evening of October 8, 1995. Rather than answering the prosecutor's question, Mrs. Jackson proceeded to explain that she had had a feeling or premonition that something bad was happening to her daughter, and further, that she had had a vision of a "big man" holding somebody down on the floor. Martin did not object to Mrs. Jackson's testimony concerning her premonition, and the State did not further inquire into the specifics of Mrs. Jackson's premonition. Rather, the State recast its earlier question, asking Mrs. Jackson whether she and her husband were home on the evening of October 8, 1995.
This Court has held that an improper statement by a witness does not rise to the level of plain error, where it "was a single, isolated comment that was not timely objected to, which was unresponsive to the question posed by the prosecutor, and which the prosecutor did not exploit." Whitehead v. State,777 So.2d 781, 829 (Ala.Crim.App. 1999) (citing Parker v. State,587 So.2d 1072 (Ala.Crim.App. 1991)), aff'd, 777 So.2d 854 (Ala. 2000), cert. denied, 532 U.S. 907, 121 S.Ct. 1233,149 L.Ed.2d 142 (2001).
Moreover, any further inquiry into Mrs. Jackson's premonition was developed during Martin's cross-examination. Of particular interest to Martin's defense counsel was Mrs. Jackson's premonition/vision concerning a "big man" standing over someone, presumably her daughter. Given that Martin was a relatively small man,[3] defense counsel sought to use Mrs. Jackson's testimony to Martin's benefit as exculpatory evidence. On appeal, however, Martin argues to this Court that the admission of Mrs. Jackson's testimony warrants reversal of his conviction. "[A] party cannot allege as error proceedings in the trial court that were invited by him or that were a natural consequence of his own action." Taylor v. State, 808 So.2d 1148, 1202 (Ala.Crim.App. 2000), aff'd, 808 So.2d 1215 (Ala. 2001), cert. denied,534 U.S. 1086, 122 S.Ct. 824, 151 L.Ed.2d 705 (2002). This rule applies to capital and noncapital cases alike. 808 So.2d at 1203. Assuming that Mrs. Jackson's testimony concerning her premonition should have been excluded, any potential error was invited by Martin's decision to use her testimony to his benefit during cross-examination. Therefore, there was no plain error here.
 V.
Martin also argues that the trial court erred in admitting into evidence the clothing he was wearing on the morning after the victim's death. Specifically, Martin argues that the State failed to establish a chain of custody for the clothing and that the clothing was mishandled, resulting in possible cross-contamination of the clothes by other evidence collected. *Page 748 
 A.
Martin argues that the trial court erred in admitting the clothing exhibits because, he says, the State failed to establish a chain of custody for each item. At trial, Martin did not make a chain-of-custody objection; therefore, we will review this claim pursuant to the plain-error rule.
In Ex parte Slaton, 680 So.2d 909 (Ala. 1996), cert. denied,519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997), the Alabama Supreme Court discussed the requirements for establishing the chain of custody:
 "Ex parte Holton, 590 So.2d 918 (Ala. 1991), sets forth the legal analysis to be applied in determining if a proper chain of custody has been established:
 "`The chain of custody is composed of "links." A "link" is anyone who handled the item. The State must identify each link from the time the item was seized. In order to show a proper chain of custody, the record must show each link and also the following with regard to each link's possession of the item: "(1) [the] receipt of the item; (2) [the] ultimate disposition of the item, i.e., transfer, destruction, or retention; and (3) [the] safeguarding and handling of the item between receipt and disposition." Imwinklereid, The Identification of Original, Real Evidence, 61 Mil. L.Rev. 145, 159 (1973).
 "`If the State or any other proponent of demonstrative evidence, fails to identify a link or fails to show for the record any one of the three criteria as to each link, the result is a "missing" link, and the item is inadmissible. If, however, the State has shown each link and has shown all three criteria as to each link, but has done so with circumstantial evidence, as opposed to the direct testimony of the "link," as to one or more criteria or as to one or more links, the result is a "weak" link. When the link is "weak," a question of credibility and weight is presented, not one of admissibility.'
 "590 So.2d at 920. While each link in the chain of custody must be identified, it is not necessary that each link testify in order to prove a complete chain of custody. Harrison v. State, 650 So.2d 603
(Ala.Crim.App. 1994)."
680 So.2d at 918. "`In order to establish a proper chain, the State must show to a "reasonable probability that the object is in the same condition as, and not substantially different from, its condition at the commencement of the chain."'" Ingram v.State, 779 So.2d 1225, 1254 (Ala.Crim.App. 1999) (quoting Exparte Holton, 590 So.2d at 919-20 (citation omitted inHolton)), aff'd, 779 So.2d 1283 (Ala. 2000), cert. denied,531 U.S. 1193, 121 S.Ct. 1194, 149 L.Ed.2d 109 (2001). "[E]vidence that an item has been sealed is adequate circumstantial evidence to establish the handling and safeguarding of the item." Lane v.State, 644 So.2d 1318, 1321 (Ala.Crim.App. 1994); see alsoIngram v. State, 779 So.2d at 1254. Additionally, "`[c]hain of custody requirements do not apply with the same force to items of evidence which are unique and identifiable in themselves.'" Exparte Scott, 728 So.2d 172, 182 (Ala. 1998) (quoting Magwood v.State, 494 So.2d 124, 144 (Ala.Crim.App. 1985), aff'd,494 So.2d 154 (Ala.), cert. denied, 479 U.S. 995, 107 S.Ct. 599,93 L.Ed.2d 599 (1986)), cert. denied, 528 U.S. 831, 120 S.Ct. 87,528 U.S. 831 (1999).
Here, Mobile police Cpl. Donald Pears, testified that he collected the clothing Martin was wearing on the morning following the victim's death and placed it in a paper bag. Cpl. Pears testified that he maintained custody and control of Martin's *Page 749 
clothing until he turned it over to crime scene investigator Cpl. Charles Bailey the following day. Cpl. Bailey, in turn, testified that he had received Martin's clothing from Cpl. Pears, put it in airtight cans, and delivered the clothing to the Department of Forensic Sciences. Scott Milroy, a forensic examiner with the Department of Forensic Sciences, testified that he received Martin's clothing from Cpl. Bailey for analysis and examination. Upon completion of its analysis and examination, the Department returned Martin's clothing to Cpl. Bailey, who secured it in the property section.
Martin argues, however, that the State failed to show an unbroken chain of custody based on, he says, inconsistencies in Cpl. Bailey and Scott Milroy's testimony concerning whether the clothing was removed from the paper bag before being placed in the airtight cans. At one point, Bailey testified that he did not take the clothing out of the paper bag before he put it in the airtight cans. However, Milroy testified that the clothing was not in a paper bag when he opened the airtight cans for testing. Contrary to Martin's claim, this inconsistency does not mandate that the clothing evidence be excluded. At best, this inconsistence constitutes a "weak link" in the chain of custody. As such, this weak link is insufficient to constitute plain error.
In any event, each of the witnesses who collected, transported, and handled the clothing identified the evidence as the items they collected during the course of the investigation.
 "Physical evidence connected with or collected in the investigation of a crime shall not be excluded from consideration by a jury or court due to a failure to prove the chain of custody of the evidence. Whenever a witness in a criminal trial identifies a physical piece of evidence connected with or collected in the investigation of a crime, the evidence shall be submitted to the jury or court for whatever weight the jury or court may deem proper. The trial court in its charge to the jury shall explain any break in the chain of custody concerning the physical evidence."
§ 12-21-13, Ala. Code 1975. Therefore, any question as to the adequacy of the safeguarding and handling of the evidence did not go to its admissibility. Rather, it went to the weight the jury would assign to the evidence.
For these reasons, Martin's claim concerning the chain of custody is without merit.
 B.
Martin further argues that the trial court erred in admitting testimony that his clothing tested positive for gasoline/petroleum residue. Specifically, Martin argues that the clothing was probably contaminated by other evidence because of the manner in which the clothing was collected and stored. Additionally, Martin argues that the trial court should have made a specific finding that the testimony was reliable.
Whether evidence is admissible is generally left to the sound discretion of the trial court; that court's determination will not be disturbed on appeal, except upon a clear showing of abuse of discretion. Ex parte Loggins, 771 So.2d 1093, 1103 (Ala. 2000); see also Sweeney v. Purvis, 665 So.2d 926, 930 (Ala. 1995) ("[T]he trial court has great discretion in determining whether evidence . . . should be admitted or excluded."). "[T]o be entitled to a reversal of a judgment for an abuse of discretion, the party claiming abuse must establish that it was prejudiced by the alleged abuse." Ex parte Harwell,639 So.2d 1335, 1336 (Ala. 1993) (citing Valley Properties, *Page 750 Inc. v. Strahan, 565 So.2d 571, 583 (Ala. 1990)).
Martin argues that the trial court abused its discretion when it failed to expressly find that the evidence regarding the gasoline/petroleum residue found on his clothing was reliable. As authority for this claim, Martin relies primarily on Daubert v.Merrell Dow Pharmaceuticals, 509 U.S. 579, 113 S.Ct. 2786,125 L.Ed.2d 469 (1993). Such reliance is misplaced. Daubert and its progeny stand merely for the proposition that "under the [Federal] Rules [of Evidence] the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. at 589, 113 S.Ct. 2786. Moreover, the Daubert analysis is inapplicable in this case because Martin does not question the reliability of the method the State's expert used in determining whether his clothing contained gasoline/petroleum residue. Instead, Martin's focus is whether his clothing tested positive for petroleum residue as a result of cross-contamination from other evidence, i.e., the conclusion, rather than the testing principles and methodology central to the Daubert analysis. 509 U.S. at 595,113 S.Ct. 2786.
Rule 402, Ala.R.Evid., provides:
 "All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States or that of the State of Alabama, by statute, by these rules, or by other rules applicable in the courts of this State. Evidence which is not relevant is not admissible."
Evidence indicating that Martin's clothing tested positive for gasoline/petroleum residue is relevant to the question of whether he murdered the victim by burning her alive in her car. Here, the trial court correctly determined the possibility that Martin's clothes had been cross-contaminated went to the weight the jury should afford the evidence, and not its admissibility. The trial court's decision was in accordance with the Supreme Court's decision in Turner v. State, 746 So.2d 355 (Ala. 1998). Addressing the admissibility of DNA evidence, the Court noted: "Whether otherwise reliable testing procedures were performed without error in a particular case goes to the weight of the evidence, not its admissibility." 746 So.2d at 361. Here, Martin's attorneys cross-examined the State's witnesses in great detail concerning the possibility that the clothes had been cross-contaminated by other evidence. Thus, the jury was cognizant of the fact that the petroleum residue found on Martin's clothing could have come from cross-contamination by other evidence, rather than by his actual contact with gasoline. Based on the foregoing, the trial court did not abuse its discretion by admitting the clothing into evidence.
 VI.
Martin next argues that the trial court erred in allowing retired Mobile police officer Frank Woodard to testify concerning the flammability of a BIC cigarette lighter found near the victim's burned-out car. Specifically, Martin argues that Woodard lacked the requisite knowledge or skill to be qualified as an expert, and that Woodard's opinion was not based on "a test that is generally acceptable in the scientific community." (Martin's brief, pp. 59-60.)
 A.
Martin first argues that the trial court erred in allowing Woodard to testify as an expert witness. We note that because Martin did not object to Woodard's testimony on this basis at trial, we review this claim under the plain-error rule.
Rule 702, Ala.R.Evid., provides:
 "If scientific, technical, or other specialized knowledge will assist the trier of *Page 751 
fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."
Alabama courts have recognized a fairly broad definition of who may be qualified as an expert, so that one may gain an expertise through practical experience as well as through formal training or education. See Courtaulds Fibers, Inc. v. Long,779 So.2d 198, 202 (Ala. 2000); Eubanks v. Hale, 752 So.2d 1113, 1146
(Ala. 1999); International Telecomm. Sys. v. State,359 So.2d 364, 367-68 (Ala. 1978); see also Charles W. Gamble, McElroy'sAlabama Evidence § 127.02(2) (5th ed. 1996). The abuse-of-discretion standard is applied when reviewing a trial court's decision whether to allow a witness to testify as an expert. Eubanks v. Hale, 752 So.2d at 1146; Griffin v.Gregory, 355 So.2d 691, 692 (Ala. 1978); see also Charles W. Gamble, McElroy's Alabama Evidence § 127.02(3) (5th ed. 1996).
The record indicates that before Woodard was allowed to give an opinion regarding the flammability of a BIC cigarette lighter, he was questioned regarding his experience and qualifications. As a 30-year veteran of the Mobile Police Department, Woodard's experience was wide-ranging, including stints in the crime-scene investigation unit, traffic-accident investigation unit, the planning and research unit, and the warrant unit; he had also served as head of the police academy. Additionally, Woodard testified that he had had some training in hazardous materials. Based on Woodard's experience and training, the trial court did not abuse its discretion in allowing Woodard to testify as an expert witness.
 B.
Martin also argues that the trial court erred by allowing Woodard to testify as an expert because, he says, Woodard's opinion was not "based upon a test that is generally acceptable in the scientific community." (Martin's brief, p. 60). Again, Martin objected to Woodard's testimony on the basis that the State had failed to lay a proper predicate. Thus, this claim will also be reviewed pursuant to the plain-error rule.
Whether evidence is admissible is generally left to the sound discretion of the trial court; that court's determination will not be disturbed on appeal, except upon a clear showing of abuse of discretion. See, e.g., Ex parte Loggins, 771 So.2d 1093,1103 (Ala. 2000).
In Simmons v. State, 797 So.2d 1134 (Ala.Crim.App. 1999), cert. denied, 797 So.2d 1186 (Ala.), cert. denied, 534 U.S. 932,122 S.Ct. 298, 151 L.Ed.2d 221 (2001), this Court addressed a claim similar to Martin's; namely, that the trial court had erred in admitting into evidence the testimony of an expert witness with specialized knowledge in crime-scene analysis and victimology because the witness's testimony did not meet theFrye[4] test. We rejected Simmons's claim that the witness's testimony was based on novel scientific evidence, noting that
 "Crime-scene analysis and victimology do not rest on scientific principles like those contemplated in Frye; these fields constitute specialized knowledge. Specialized knowledge offers subjective observations and comparisons based on the expert's training, skill, or experience that may be helpful to the jury in understanding or determining the facts." *Page 752 797 So.2d at 1151 (opinion on return to remand). We went on to state that the proper standard to determine the admissibility of the witness's testimony was found in Rule 702, Ala.R.Evid.
Here, Woodard testified that the police discovered a BIC cigarette lighter at the crime scene near the victim's burned-out car. An examination of the lighter revealed "a small burn hole in the tank of the lighter." Woodard was asked if he had an opinion regarding the lighter. Woodard stated that, in his opinion, "the melting point on [the] lighter suggested that it had been exposed to fire and had been propelled from that fire as a result of the ignition of the propellant inside the container, which would be the lighter casing." (R. 425.) Such a conclusion was based on Woodard's years of police experience, and, therefore, did not constitute "novel scientific evidence." Accordingly, the admissibility of Woodard's testimony is determined by Rule 702, rather than the Frye test. Because Woodard was qualified as an expert under Rule 702, the trial court did not abuse its discretion in admitting Woodard's opinion. No basis for reversal exists as to this claim.
 VII.
Martin also argues that the trial court acted in such a manner as to show partiality to the State in the prosecution of its case. During Martin's trial, the jury was transported by bus to the crime scene and several other locations mentioned during the witnesses' testimony. Because of the size of the bus, seating was limited. When the State's lead prosecutor boarded the bus, one of the remaining seats was beside the trial judge. The prosecutor offered the seat to one of Martin's attorneys, who declined. The prosecutor then took the seat next to the trial judge. As the two men sat alongside each other, they engaged in casual conversation. Nothing concerning the trial was discussed. Although Martin's attorneys made no objection to the conversation while on the bus, they raised this matter in the motion for a new trial.
In Ex parte Melof, 553 So.2d 554, 557 (Ala. 1989),[5]
the Alabama Supreme Court held that "a mere accusation of bias that is unsupported by substantial fact does not require the disqualification of a judge." (Emphasis omitted.) The general rule in Alabama is that there is a presumption that a judge is qualified and unbiased, and a person who alleges otherwise has the burden of proving the grounds for this allegation. Riddle v.State, 669 So.2d 1014, 1019 (Ala.Crim.App. 1994); McMurphy v.State, 455 So.2d 924, 929 (Ala.Crim.App. 1984). Prejudice on the part of a judge is not presumed. "`[T]he law will not suppose a possibility of bias or favor in a judge who is already sworn to administer impartial justice and whose authority greatly depends upon that presumption and idea.'" Ex parte Balogun,516 So.2d 606, 609 (Ala. 1987) (quoting Fulton v. Longshore,156 Ala. 611, 613, 46 So. 989, 990 (1908)). *Page 753 
Our review of the record fails to establish any evidence that would require the trial judge's disqualification or that would cause anyone to question the judge's impartiality. Thus, no basis for reversal exists.
 VIII.
Martin next argues that the trial court erred in allowing, over his objection, the jury to separate between the close of the evidence and before guilt-phase deliberations began.
Our review of the record reveals that at the close of all the evidence, the trial court allowed the jurors, who had been sequestered for more than a week, to return to their homes on the night before jury deliberations began. Before releasing the jurors for the night, however, the court reminded them that they could not discuss the case with anyone, read any newspaper articles concerning the case, or watch any television news reports regarding the case.
Since the 1995 amendment to § 12-16-9, Ala. Code 1975, the decision whether to permit jurors to separate has been placed exclusively within the trial court's discretion.[6] See Exparte Drinkard, 777 So.2d 295, 305 (Ala. 2000) (rejecting a claim that it was error for the trial court to allow the jury to separate over the defendant's objections); Ex parte Stewart,730 So.2d 1246, 1251 (Ala.) (same), cert. denied, 528 U.S. 846,120 S.Ct. 119, 145 L.Ed.2d 101 (1999). Likewise, there is no merit to Martin's claim that the trial court erred by allowing the jury to separate, based on a discrepancy between Rule 19.3, Ala. R.Crim.P., and § 12-16-9. Indeed, in Smith v. State,727 So.2d 147, 154 (Ala.Crim.App. 1998), aff'd, 727 So.2d 173
(Ala.), cert. denied, 528 U.S. 833, 120 S.Ct. 91, 145 L.Ed.2d 77
(1999),[7] this Court rejected a claim similar to the one Martin raises, noting that the rule and the statute were now in conformity.
 IX.
Martin argues that the Alabama Supreme Court's amendment of Rule 39, Ala. R.App.P., effective May 19, 2000, eliminating automatic review of death-penalty cases, unconstitutionally limits his right of appellate review. Martin further contends that to change the process of review violates his due-process and equal-protection rights, although he makes no attempt to set out precisely how those rights have been affected.
In Alabama, all persons convicted of a criminal offense are granted the right to an appeal by § 12-22-130, Ala. Code 1975. This appeal of right is to the Court of Criminal Appeals. See §12-3-9, Ala. Code 1975. Any subsequent review of a criminal conviction by a higher state appellate court is by writ of certiorari to the Alabama Supreme Court. See Rule 39, Ala.R.App.P. Since Rule 39, Ala.R.App.P., was amended, effective May 19, 2000, as to death-penalty cases, review by certiorari is entirely discretionary with the Supreme Court in all criminal cases, including those in which the death penalty has been imposed.
The Alabama Supreme Court amended Rule 39, Ala.R.App.P., pursuant to the rule-making authority set out in § 12-2-7(4), *Page 754 
Ala. Code 1975. That section authorizes the Supreme Court
 "[t]o make and promulgate rules governing the administration of all courts and rules governing practice and procedure in all courts; provided, that such rules shall not abridge, enlarge, or modify the substantive right of any party nor affect the jurisdiction of circuit and district courts or venue of actions therein; and provided further, that the right of trial by jury as at common law and declared by Section 11 of the Constitution of Alabama of 1901 shall be preserved to the parties inviolate."
Only the Supreme Court enjoys this rule-making authority. Moreover, just as this Court is bound by the decisions of the Supreme Court, see § 12-3-16, Ala. Code 1975, we are also bound by any applicable rules adopted by that Court. See Maddox v.State, 708 So.2d 220, 222 (Ala.Crim.App. 1997) (recognizing that we were bound to follow the jury-selection procedure established in Rule 18.4, Ala.R.Crim.P.). Therefore, this Court has no authority to grant Martin relief as to this claim.
When the Supreme Court used its rule-making authority to establish a jury-selection procedure, this Court concluded that "the jury selection process used in criminal trials is one that the Alabama Supreme Court believes best serves the ends of justice and the needs of this state." Maddox v. State,708 So.2d at 222. Likewise, we believe that the Supreme Court's decision to engage in discretionary review of death cases is one that that Court "believes best serves the ends of justice and the needs of this state." Therefore, no relief is warranted as to this claim.
 Penalty-Phase Issues X.
Martin argues that the death penalty as imposed by the State of Alabama violates the Eighth Amendment's prohibition against cruel and unusual punishment. Alternatively, Martin argues that the trial court's authority to override a jury's advisory verdict of life imprisonment without parole and to impose the death sentence is likewise unconstitutional.
Martin's argument has been rejected by this Court on numerous occasions:
 "There is an abundance of caselaw . . . that holds that the death penalty is not per se cruel and unusual punishment. Neither is electrocution, as a means of capital punishment, cruel and unusual punishment, in violation of the Eighth Amendment. Williams v. State, 556 So.2d 737, 741 (Ala.Cr.App. 1986), aff'd in part, rev'd in part on other grounds, 556 So.2d 744 (Ala. 1987); Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972); Zant v. Stephens, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983); Boykin v. State, 281 Ala. 659, 207 So.2d 412 (1968), reversed on other grounds, Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969)."
Scott v. State, 728 So.2d 164, 171 (Ala.Crim.App. 1997), aff'd, 728 So.2d 172 (Ala. 1998), cert. denied, 528 U.S. 831,120 S.Ct. 87, 145 L.Ed.2d 74 (1999). See also Stephens v. State,580 So.2d 11, 26 (Ala.Crim.App. 1990), aff'd, 580 So.2d 26
(Ala.), cert. denied, 502 U.S. 859, 112 S.Ct. 176,116 L.Ed.2d 138 (1991); and Thompson v. State, 542 So.2d 1286
(Ala.Crim.App. 1988), aff'd, 529 So.2d 1300 (Ala.), cert. denied,493 U.S. 874, 110 S.Ct. 208, 107 L.Ed.2d 161 (1989).
Martin offers no novel arguments in support of his contention. Accordingly, we rely on our previous holdings and reject his contention that the death penalty as used by the State of Alabama constitutes cruel and unusual punishment. We further *Page 755 
note the passage of Act No. 2002-492, Ala. Acts 2002, which provides for lethal injection as an alternate means of execution. Act No. 2002-492 became effective July 1, 2002. Based on the passage of this Act, Martin's argument is effectively moot.
Likewise, we reject Martin's argument that it is unconstitutional for a trial court to override a jury's advisory verdict of life imprisonment without parole and impose the death sentence. See, e.g., Harris v. Alabama, 513 U.S. 504, 515,115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995); Ex parte Jones,456 So.2d 380, 381-83 (Ala. 1984), cert. denied, 470 U.S. 1062,105 S.Ct. 1779, 84 L.Ed.2d 838 (1985).
 XI.
Martin next argues that the trial court improperly sentenced him to death. Specifically, Martin argues that the trial court was predisposed to impose the death sentence, based on the court's preparation of two sentencing orders — one imposing life imprisonment without the possibility of parole, and the other imposing the death sentence — the day before the sentence hearing. The court's preparation of the alternate orders, Martin argues, indicated that the court "had begun the `judging process' without benefit of all potential evidence and without benefit of closing arguments." (Martin's brief, p. 65.)
Our review of the record does not support Martin's claim. The jury returned its advisory verdict on May 11, 2000, recommending by a vote of 8-4 that Martin be sentenced to life imprisonment without the possibility of parole. The trial court ordered that a presentence report be prepared and set Martin's sentence hearing for July 25, 2000. Contrary to Martin's claim, there is no evidence that the trial court had "prejudged" his case. Thus, Martin's reliance on Ex parte White, 53 Ala.App. 377,300 So.2d 420 (1974), is misplaced. We find no evidence in the record of any bias against Martin. Indeed, it is clear from the court's preparation of alternate sentencing orders that the court remained undecided as to which sentence would imposed — life imprisonment without parole or death. "`Where the record is silent on appeal, it will be presumed that what ought to have been done was not only done, but rightly done.'" Owens v.State, 597 So.2d 734, 736 (Ala.Crim.App. 1992) (quoting Jollyv. State, 405 So.2d 76, 77 (Ala.Crim.App. 1981)). "This Court will not presume error from a silent record." Frazier v. State,758 So.2d 577, 600 (Ala.Crim.App.), aff'd, 758 So.2d 611 (Ala. 1999), cert. denied, 531 U.S. 843, 121 S.Ct. 109, 148 L.Ed.2d 66
(2000). No basis for relief exists as to this claim.
 XII.
After this case was argued and submitted, the United States Supreme Court released Atkins v. Virginia, 536 U.S. 304,122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), and Ring v. Arizona,536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) — two cases that had a dramatic impact on death-penalty cases throughout the United States. We requested that Martin and the attorney general brief the issue of the applicability of Ring to Martin's conviction and death sentence.[8] We now address those arguments.[9] *Page 756 
In Ring, the United States Supreme Court applied its earlier holding in Apprendi v. New Jersey, 530 U.S. 466,120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), to death-penalty cases and held that "[c]apital defendants . . . are entitled to a jury determination on any fact on which the legislature conditions an increase in their maximum punishment." Ring, 536 U.S. at 589,122 S.Ct. 2428.
Martin argues that imposition of the death penalty in Alabama requires fact-finding by a jury relating to both the existence of aggravating circumstances and the weighing of the aggravating circumstances against the mitigating circumstances. Because only the trial judge made these findings and the jury was not given the opportunity to return a verdict on any of the aggravating circumstances in his case, he argues that the Supreme Court's holding in Ring renders him ineligible for the death penalty. Martin also argues that the trial court's finding of a second aggravating circumstance, that the murder was especially heinous, atrocious, or cruel as compared to other capital offenses, violated his Sixth Amendment right to a trial by jury. Martin further argues that Ring prevents a trial court from overriding a jury's advisory verdict. Finally, Martin argues that both Alabama and federal law condemn the imposition of the death penalty by a judge, rather than by a jury.
The State counters by arguing that Martin's death sentence complies with Ring because the jury found at the guilt phase that Martin had committed a capital offense, thus making him eligible for the death sentence. Accordingly, the circuit court had the discretion under Ring to impose either the death sentence or a lesser sentence, with or without the approval of the jury.
In several recent decisions, both this Court and the Alabama Supreme Court have agreed with the State's argument that Ring
did not invalidate Alabama's law, which vests the ultimate sentence determination in the hands of the trial judge, and not a jury. See, e.g., Ex parte Hodges, 856 So.2d 936 (Ala. 2003);Ex parte Waldrop, 859 So.2d 1181 (Ala. 2002); Turner v.State, 924 So.2d 737 (Ala.Crim.App. 2002); Stallworth v.State, 868 So.2d 1128 (Ala.Crim.App. 2001), opinion on return to second remand, 868 So.2d 1128. In each of those cases, we recognized the narrowness of the holding in Ring, noting that "[t]he Ring Court held that any aggravating circumstance that increased a sentence to death must be proved to a jury beyond a reasonable doubt"; however, we noted that the Ring Court "did not reach the question whether judicial sentencing or judicial override was constitutional." Stallworth v. State,868 So.2d at 1183 (opinion on return to second remand). Indeed, we quote the following language from a footnote in Ring:
 "Ring's claim is tightly delineated: He contends only that the Sixth Amendment required jury findings on the aggravating circumstances asserted against him. No aggravating circumstance related to past convictions in his case; Ring therefore does not challenge Almendarez-Torres v. United States, 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998), which held that the fact of prior conviction may be found by the judge even if it increases the statutory maximum sentence. He makes no Sixth Amendment claim with respect to mitigating circumstances. See Apprendi v. New Jersey, 530 U.S. 466, 490-491, *Page 757 
n. 16, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) (noting `the distinction the Court has often recognized between facts in aggravation of punishment and facts in mitigation' (citation omitted [in Ring])). Nor does he argue that the Sixth Amendment required the jury to make the ultimate determination whether to impose the death penalty. See Proffitt v. Florida, 428 U.S. 242, 252, 96 S.Ct. 2960, 49 L.Ed.2d 913
(1976) (plurality opinion) (`[I]t has never [been] suggested that jury sentencing is constitutionally required.'). He does not question the Arizona Supreme Court's authority to reweigh the aggravating and mitigating circumstances after that court struck one aggravator. See Clemons v. Mississippi, 494 U.S. 738, 745, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990). Finally, Ring does not contend that his indictment was constitutionally defective. See Apprendi, 530 U.S. at 477, n. 3, 120 S.Ct. 2348, 147 L.Ed.2d 435
(Fourteenth Amendment `has not . . . been construed to include the Fifth Amendment right to "presentment or indictment of a Grand Jury"')."
536 U.S. at 597 n. 4, 122 S.Ct. 2428 (emphasis added).
Here, the jury in the guilt phase entered a verdict finding Martin guilty of capital murder because it was committed for pecuniary gain. Murder committed for pecuniary gain is also an aggravating circumstance. See § 13A-5-49(6), Ala. Code 1975. This verdict made Martin eligible for the death penalty. As §13A-5-45(e) provides:
 "At the sentence hearing the state shall have the burden of proving beyond a reasonable doubt the existence of any aggravating circumstances. Provided, however, any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentence hearing."
See Stallworth v. State, 868 So.2d at 1184; Turner v. State,924 So.2d at 785.
The trial court also found that the murders were especially heinous, atrocious, or cruel as compared to other capital murders. See § 13A-5-49(8), Ala. Code 1975. The State argues that because by its verdict in the guilt phase a jury had already found the existence of one aggravating circumstance that the murder was committed for pecuniary gain any other aggravating circumstance the court found could not increase his sentence. We have agreed with this rationale. See Stallworth v. State,868 So.2d at 1185; Turner v. State, 924 So.2d at 786. Martin was eligible for the death penalty based on the jury's finding in the guilt phase of the existence of the aggravating circumstance that the murder was committed for pecuniary gain. The trial court's application of other aggravating circumstances did not violateRing.
We further conclude that the United State Supreme Court's decision in Harris v. Alabama, 513 U.S. 504, 515,115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995), upholding Alabama's judicial-override procedure, remains in force. We have carefully reviewed Ring for any impact it has on Harris v. Alabama.
Nowhere in Ring do we find any indication that it affects a sentencing procedure that allows the trial judge to reject the jury's advisory verdict. Moreover, the Ring Court left intact that portion of Walton v. Arizona, 497 U.S. 639,110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), validating judicial sentencing in capital cases. The holdings in Ring and Apprendi focus on the fact that the defendant in each case received a sentence exceeding the maximum that he could have received *Page 758 
under the facts reflected by the jury's verdict alone. Ring,536 U.S. at 597-98, 122 S.Ct. 2428. Here, the sentence imposed by the trial court was not above the maximum Martin could have received based on the jury's verdict finding him guilty of murder for pecuniary gain. In Harris v. Alabama, the Supreme Court stated, "[t]he Constitution permits the trial judge, acting alone, to impose a capital sentence. It is thus not offended when a State further requires the sentencing judge to consider a jury's recommendation and trusts the judge to give it the proper weight." 513 U.S. at 515, 115 S.Ct. 1031. Because the holdings inRing and Apprendi do not conflict with Harris v. Alabama,
the trial court acted within its authority in overriding the jury's advisory verdict of life without parole and sentencing Martin to death.
 XIII.
As required by § 13A-5-53, Ala. Code 1975, we will now address the propriety of Martin's conviction and sentence of death.
The record reflects that Martin's sentence was not imposed under "the influence of passion, prejudice, or any other arbitrary factor." § 13A-5-53(b)(1), Ala. Code 1975.
The trial court found that the aggravating circumstances outweighed the mitigating circumstances and mandated a sentence of death. The trial court did not accept the jury's recommendation, but chose to use its judicial authority to override the jury's recommendation and sentence Martin to death. The judicial override in capital convictions has been held to be constitutional. Harris v. Alabama, 513 U.S. 504,115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995); Ex parte Jones, 456 So.2d 380
(Ala. 1984), cert. denied, 470 U.S. 1062, 105 S.Ct. 1779,84 L.Ed.2d 838 (1985). The trial court found as aggravating circumstances that the murder was committed for "pecuniary gain," and that the murder was "especially heinous, atrocious, or cruel compared to other capital offenses." See § 13A-5-49(6) and §13A-5-49(8), Ala. Code 1975. The court's finding that the victim's murder was especially heinous, atrocious, or cruel was predicated on the fact that
 "Hammoleketh Martin was burned to death, and that she was alive and conscious for a period of time prior to death and realized that she was being burned alive. This was proven by the testimony of Dr. Leroy Riddick, the State's medical examiner. If burning a human being alive is not an example of what is heinous, atrocious or cruel, then in this Court's opinion these words lack meaning."
(C. 127.)
In Barksdale v. State, 788 So.2d 898 (Ala.Crim.App.), cert. denied, 788 So.2d 915 (Ala. 2000), cert. denied, 532 U.S. 1055,121 S.Ct. 2200, 149 L.Ed.2d 1030 (2001), we addressed the application of this aggravating circumstance, stating as follows:
 "In Ex parte Kyzer, 399 So.2d 330, 334 (Ala. 1981), this Court held that the standard applicable to the `especially heinous, atrocious, or cruel' aggravating circumstance under § 13A-5-49(8), Ala. Code 1975, is that the crime must be one of `those conscienceless or pitiless homicides which are unnecessarily torturous to the victim.' The appellant's assertion that the murder was not unnecessarily torturous to the victim because he did not intentionally inflict prolonged pain upon the victim is without merit. It is not, as the appellant argues, incumbent upon the State to prove that he inflicted savagery or brutality upon the victim, or that he took pleasure in having committed the murder. It is necessary that the *Page 759 
State present evidence that the victim suffered some type of physical violence beyond that necessary or sufficient to cause death. Additionally, to support this aggravating factor, the time between at least some of the injurious acts must be an appreciable lapse of time, sufficient enough to cause prolonged suffering, and the victim must be conscious or aware when at least some of the additional or repeated violence is inflicted. See Norris v. State, [793] So.2d [847] (Ala.Cr.App. 1999)."
788 So.2d at 907-08.
Here, the testimony of the medical examiner established that the victim was still alive when Martin set fire to her automobile, literally burning her alive. Evidence that a victim was killed by fire and smoke inhalation has been found to meet the definition of a crime that is especially heinous, atrocious, or cruel. See Dunaway v. State, 746 So.2d 1021, 1040
(Ala.Crim.App. 1998), aff'd, 746 So.2d 1042 (Ala. 1999).
Section 13A-5-53(b)(2), Ala. Code 1975, requires us to weigh the aggravating and mitigating circumstances independently to determine the propriety of Martin's death sentence. After independently weighing the aggravating circumstances and the mitigating circumstances, we find that the death sentence is appropriate in this case.
As required by § 13A-5-53(b)(3), Ala. Code 1975, we must determine whether Martin's death sentence was disproportionate or excessive when compared to the penalties imposed in similar cases. Martin killed his wife in order to collect approximately $377,000 in life insurance. Similar crimes have been punished by death on numerous occasions. See, e.g., Ex parte Scott,728 So.2d 172, 191 (Ala. 1998), cert. denied, 528 U.S. 831,120 S.Ct. 87, 145 L.Ed.2d 74 (1999); Sockwell v. State, 675 So.2d 4, 12
(Ala.Crim.App. 1993), aff'd, 675 So.2d 38 (Ala. 1995), cert. denied, 519 U.S. 838, 117 S.Ct. 115, 136 L.Ed.2d 67 (1996);Harris v. State, 632 So.2d 503 (Ala.Crim.App. 1992), aff'd,632 So.2d 543 (Ala. 1993), aff'd, 513 U.S. 504, 115 S.Ct. 1031,130 L.Ed.2d 1004 (1995).
Finally, as required by Rule 45A, Ala. R.App.P., we have searched the record for any error that may have adversely affected Martin's substantial rights and have found none. Martin's conviction and death sentence for the murder of Hammoleketh Jackson Martin are due to be, and are hereby, affirmed.
AFFIRMED.
McMILLAN, P.J., and COBB, BASCHAB, and SHAW, JJ., concur.
[1] The trial court's order referred only to the two major insurance policies on Hammoleketh Martin's life. There were several other insurance policies for minor amounts that were not mentioned in the court's order.
[2] Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194,10 L.Ed.2d 215 (1963).
[3] The presentence investigation describes Martin as 5'7" tall and weighing 165 pounds. (R. 2758.)
[4] Frye v. United States, 293 F. 1013 (D.C. Cir. 1923).
[5] We note that this case has, to some extent, been abrogated by the Alabama Supreme Court in Ex parte Crawford,686 So.2d 196 (Ala. 1996). After reviewing the decision in Crawford, we find that this decision merely abrogated language concerning appellate review of a trial judge's decision whether to recuse himself or herself from a case. Crawford holds that a recusal issue may be raised either on appeal, after having been properly preserved at trial, or by a petition for a writ of mandamus. To the extent that the decision in Ex parte Melof holds otherwise, it is abrogated by Crawford. However, the decision inCrawford does not affect the underlying holding of Melof as it pertains to the applicable law on recusal.
[6] The cases cited as authority by Martin for this contention are decisions that predate the amendment to § 12-16-9, Ala. Code 1975.
[7] In Ex parte Borden, 769 So.2d 950 (Ala. 2000), the Alabama Supreme Court criticized this Court's decision in Smith
as being "based on a mistakenly expansive reading of Rule 3.3(a), Ala.R.Crim.P." 769 So.2d at 959. However, the discussion of Rule 19.3, Ala. R.Crim.P., in Smith remains unaffected by theBorden decision.
[8] Atkins addresses the rights of mentally retarded persons sentenced to death. Nothing in the record suggests that Martin was mentally retarded. Thus, because Atkins had no application to this case, we did not request that the parties address the applicability of Atkins.
[9] Because Rule 45A, Ala.R.App.P., requires this Court to search the record for any plain error and because Martin's case was not final when Ring was released, we have applied Ring to this appeal. See Griffith v. Kentucky, 479 U.S. 314,107 S.Ct. 708, 93 L.Ed.2d 649 (1987).