Norman Lee McClendon was convicted, following a jury trial, of criminal solicitation, for soliciting Allen Schwiening to murder McClendon's wife, Yvonne. § 13A-4-1, Ala. Code 1975. McClendon was ordered to serve 99 years' imprisonment, was fined $20,000, and was ordered to pay $10,000 to the Alabama Crime Victims Compensation Fund. McClendon appeals. We affirm.
This case presents unusual and difficult legal issues. The underlying conviction for criminal solicitation is not common in Alabama cases. Additionally, during the trial, the trial court admitted evidence of collateral bad acts that occurred nearly 20 years before the crime for which McClendon was tried; the admission of that evidence required substantial analysis under relevant legal principles in order to reach what, we believe, is the correct conclusion in this case.
Law enforcement officers testified that, on the evening of September 20, 1995, Yvonne McClendon, McClendon's wife, was reported missing by her daughters. An extensive search was conducted, but Yvonne was never found, alive or dead. A search of the McClendon house on the night of Yvonne's disappearance revealed that her purse, clothing, and other personal belongings were in the house. Only Yvonne and her jewelry were missing. *Page 939 
Allen Schwiening testified that he knew Norman McClendon and Yvonne McClendon because he had dated Yvonne's daughter, Robbie Robinson, for a few months in early 1995. He had spent time with the McClendons on a few occasions, and he had seen Yvonne and Norman "fussing" on two occasions. Schwiening explained that, on those occasions, the McClendons had made comments to each other such as "I hate you," "I'll kill you," and "I would be better off without you." (R. 87.)
Schwiening testified that he had once helped Norman McClendon deliver hay to James Siggers. McClendon and Siggers had talked for a few minutes, and McClendon had become agitated. When they left Siggers's residence, McClendon drove around in the pasture behind Robbie's trailer for approximately 20 minutes. During the drive, McClendon was upset and agitated, Schwiening said, and he said Yvonne had been "keeping tabs on him." When they parked outside Robbie's trailer, Schwiening noticed that the guns in McClendon's gunrack were rusted and in bad condition, and Schwiening offered to re-blue them. After they discussed guns, McClendon asked Schwiening if he would be interested in killing Yvonne. Schwiening told him that he would not be. McClendon then asked whether Schwiening had any friends who would be interested in making some quick cash; McClendon mentioned a dollar amount, but Schwiening could not remember the amount. Schwiening told McClendon that he did not have those kind of friends. The conversation made him nervous, Schwiening said, but he did not know whether McClendon was serious. (R. 95-96, 112.)
Schwiening got out of McClendon's truck, went into Robbie's trailer, gathered his belongings, and left. He had not planned to leave at that time; he said he did so because of his conversation with McClendon. Schwiening told only his roommate in Tallassee about McClendon's solicitation, until sometime later when he received a telephone call from his father, who told him that a newspaper had reported that Yvonne McClendon was missing. Schwiening immediately contacted the Randolph County Sheriff's Office and cooperated with law enforcement in the investigation of Yvonne's disappearance.
James Siggers testified that he had been acquainted with Yvonne for many years because they had worked together at a cotton mill, and that he became acquainted with Norman McClendon when he moved onto McClendon's farm. Siggers recalled the day he met Allen Schwiening, when Schwiening accompanied McClendon to deliver some hay.
Robbie Robinson and Cindy Smith testified that Yvonne McClendon was their mother, and that Yvonne had been married to Norman McClendon for approximately 20 years before she disappeared. Smith and Robinson said that McClendon and their mother had bickered and fought constantly, and Robinson testified that the two had repeatedly threatened to kill each other. Yvonne accused McClendon of having extramarital affairs. Smith and Robinson said that, before she disappeared, Yvonne told McClendon repeatedly that she wanted a divorce and that she wanted half of his retirement payout, which he was due to receive in October. McClendon had retired on June 1, 1995, and a check for $57,000, representing the payout of his retirement, was issued on October 1, 1995.
Smith said that she last saw her mother at 4:00 p.m. on September 20, 1995, the day she disappeared, when she went to her mother's house for their daily visit. At approximately 7:00 p.m., Robinson contacted Smith because Yvonne was not at home, and Smith returned to her mother's house. McClendon did not appear to be concerned *Page 940 
about Yvonne's disappearance, and he did not join in the search for her. In the weeks following Yvonne's disappearance, McClendon did not alter his normal routine.
Cindy Smith testified that Yvonne and McClendon had begun dating in 1976, while McClendon was still married to his first wife, the late Joanne McClendon. Smith said that, while Yvonne and McClendon were dating, McClendon and Rabren Cagle came to Yvonne's house and the three of them discussed ways to murder Joanne. Smith said that she was 14 years old when she overheard these conversations. Initially, they discussed killing Joanne in a car wreck, but the plan changed and they discussed having someone kill her at home for $25,000. Smith testified that Rabren Cagle contacted a man in Georgia about killing Joanne; he telephoned the man from Yvonne's house, Smith said. She said she saw McClendon give Cagle a thick envelope and a key approximately two months before Joanne was killed. Joanne was murdered in her home a few months after Yvonne and McClendon began dating.
Smith told no one about the conversations she had overheard until October 1995, after her mother had disappeared.[1] Soon after Smith revealed these conversations, Robbie Robinson filed a civil action against McClendon, which Smith later joined.
Joanne and Norman McClendon's daughter, Patrice Melton, testified that her parents were not getting along before Joanne was murdered, and that Joanne had asked for a divorce. Melton knew Rabren Cagle; she said that, on several occasions in the months before her mother was murdered, she was in the truck with McClendon when he went to Cagle's house. She did not hear what the two men discussed. On one occasion, Cagle got into the truck with them and McClendon drove to some property next to the McClendons' property, and McClendon pointed out their house to Cagle. McClendon was in the hospital when Joanne was killed.
Several witnesses testified about conversations they had with McClendon during his marriage to Yvonne. Onward Hollaway testified that he knew McClendon and Yvonne, because Yvonne was his first wife's niece. On three occasions in the weeks before Yvonne disappeared, McClendon told him that Yvonne was still "fussing" at him, and that the only way to get out of it was to have another funeral. (R. 244-49.)
Leonard Lee testified that he lived in a trailer on the McClendons' property for several years. Lee said that, during the summer of 1986, McClendon confided that he and Yvonne were having problems and that she nagged him constantly. He then asked Lee if he would "do a job for him." (R. 271.) McClendon told him if he agreed to do the job, he would pay any amount of money Lee charged, or he would buy Lee a new Grand Prix automobile. McClendon also asked Lee if he knew someone who might "get the job done" if Lee could not do it. Lee declined McClendon's offer, and McClendon said he needed to get the job done somehow or another. On two occasions after that, McClendon asked Lee whether he had thought anymore about what he had asked him to do. Each time, Lee replied that he had not.
Ronnie Hester testified that he was married to Cindy Smith from 1985 to 1993, and that he worked as a handyman for the *Page 941 
McClendons during that time. During the summer of 1986, McClendon told Hester that he had a problem and that he needed some help. Hester said that McClendon told him that he could not get along with Yvonne anymore, and that "it would be worth a right smart sum of money." (R. 291.) McClendon appeared to be serious about his comment, Hester said. McClendon continued to remind Hester that he had "the problem" and that "he had to have something done with Ms. Yvonne." (R. 291-93.) Hester said he had seen the McClendons argue intensely and that he had understood McClendon's concerns, but that he could not "see the actions that he was wanting to take." (R. 293.)
Johnny Ware, whom Yvonne hired to do yard work, testified that in October 1995, several days before Yvonne disappeared, he was in McClendon's truck and McClendon was showing him a fishing lake. McClendon complained to him about Yvonne and said he was tired of her. McClendon said he wanted a job done, but he did not discuss the matter further.
Keith Norred testified that, in August 1995, McClendon brought his truck to Norred's muffler shop for repairs. Norred was going through a divorce, and McClendon spoke with him about it. During the discussion, McClendon told him "that he had one that he would like to get a divorce from but looked like he couldn't." (R. 306.) The men then spoke about deer hunting, and McClendon asked Norred if he was a good shot. McClendon asked Norred if he would "do a job for him." Norred asked McClendon what kind of job, and Norred said that he responded, "[Y]ou know what we was talking about, my wife." Norred told McClendon that he was talking to the wrong person. (R. 307.)
Rabren Cagle testified on McClendon's behalf. He said that he had known Yvonne and McClendon all of his life. He testified that he did not know Joanne McClendon, and he denied discussing her murder with McClendon or taking part in her murder. Cagle acknowledged that, when the police spoke to him in December 1995 about Yvonne's disappearance, he might have asked, "If there was a middle man, how would he go about getting a deal?"
McClendon denied any knowledge of the circumstances surrounding Yvonne's disappearance. He denied soliciting Schwiening or anyone else to murder Yvonne. He told the police that he believed Yvonne had left him, but that he did not know why. McClendon used most of his retirement payout to purchase a tractor a few months after Yvonne disappeared. McClendon also denied conspiring to murder his first wife, Joanne.
 I.
McClendon argues that the trial court erred to reversal when it allowed testimony regarding his alleged involvement in the murder of his first wife, Joanne.[2] He claims that the testimony should not have been admitted because, he says, it was too remote, it was prima facie inadmissible, there was insufficient proof that he had engaged in a prior conspiracy to kill his *Page 942 
first wife, and the probative value of the testimony was outweighed by its prejudicial effect. The State argues that the trial court did not abuse its discretion when it admitted the evidence, because, it argues, the evidence was relevant to prove intent and a common plan or scheme. The State further argues that the probative value of the evidence outweighed its prejudicial effect.
The parties argued their positions on this issue to the trial court on several occasions. The trial court originally determined that, if the State could show that Yvonne McClendon had knowledge of the defendant's involvement in his first wife's death, that evidence would be relevant and material, and that it might establish a motive for Yvonne's murder. The court stated that an offer of proof would have to be made before the evidence could be placed before the jury. Before the prosecution offered the testimony of Cindy Smith and Patrice Melton, the parties again argued their positions to the court. McClendon argued that the proposed testimony would be hearsay, and that its prejudicial effect would outweigh its probative value. The trial court found that proffered evidence of McClendon's involvement in Joanne's murder would be "sound, probative, circumstantial evidence that would show motive and intent, and it should be admitted." (R. 186.) The court further found that McClendon's arguments addressed the weight of the testimony, rather than its admissibility.
After the jury heard a portion of the testimony that related to McClendon's conversations and actions regarding his first and second wives, the trial court gave an excellent, thorough instruction to the jury on the limited purposes for which the collateral act evidence was being admitted:
 "Ladies and gentlemen, there is a matter of law that I want to make clear to you. The defendant is not on trial for killing Yvonne. The defendant is not on trial for killing Joanne. Those are not charges in this case. To the extent that you have heard evidence — and it's up to you to evaluate the evidence — tending to show in connection with the death of Joanne that there was some kind of criminal conspiracy in which the defendant and others were involved, you may not draw an inference from that testimony that, well, if that happened in the case of Joanne, it might have happened in the present case. That's not the purpose of that testimony being admitted. The purpose of that testimony being admitted is solely for the purpose of showing possibility of motive for the present offense or intent for the present offense. You may not draw the conclusion, well, this has happened before, and therefore it's likely happened again. That incident in and of itself is not evidence of guilt in this case except to the extent that you think that it has probative force in connection with the matter of criminal intent in connection with the present case. It is offered and allowed solely for the purpose of your figuring out whether this earlier incident is a circumstance which tends to show intent in the present case which charges the defendant with solicitation on a particular event. The solicitation is a matter that requires corroboration. And this evidence if offered solely for the purpose of corroboration of the intent in this case."
(R. 276-77.) (Emphasis added.)
McClendon correctly asserts that collateral bad act evidence offered solely for the purpose of suggesting that the accused is guilty of the present crime is inadmissible. As the trial court correctly found, however, the evidence of McClendon's prior bad acts was offered not to establish guilt, but to establish motive and *Page 943 
intent. Alabama law has consistently held that collateral act evidence is admissible for such purposes. In Campbell v. State, 718 So.2d 123
(Ala.Crim.App. 1997), this Court explained:
 "`"`On the trial of a person for the alleged commission of a particular crime, evidence of his doing another act, which itself is a crime, is not admissible if the only probative function of such evidence is to show his bad character, inclination or propensity to commit the type of crime for which he is being tried. This is a general exclusionary rule which prevents the introduction of prior criminal acts for the sole purpose of suggesting that the accused is more likely to be guilty of the crime in question.'" "`This exclusionary rule is simply an application of the character rule, which forbids the State to prove the accused's bad character by particular deeds. The basis for the rule lies in the belief that the prejudicial effect of prior crimes will far outweigh any probative value that might be gained from them. Most agree that such evidence of prior crimes has almost an irreversible impact upon the minds of the jurors.'" Thus, the exclusionary rule serves to protect the defendant's right to a fair trial. "`The jury's determination of guilt or innocence should be based on evidence relevant to the crime.'"
 "`"If the defendant's commission of another crime or misdeed is an element of guilt, or tends to prove his guilt otherwise than by showing of bad character, then proof of such other act is admissible." The well-established exceptions to the exclusionary rule include: (1) relevancy to prove identity; (2) relevancy to prove res gestae; (3) relevancy to prove scienter; (4) relevancy to prove intent; (5) relevancy to show motive; (6) relevancy to prove system; (7) relevancy to prove malice; (8) relevancy to rebut special defenses; and (9) relevancy in various particular crimes. However, the fact that evidence of a prior bad act may fit into one of these exceptions will not alone justify its admission. "`Judicial inquiry does not end with a determination that the evidence of another crime is relevant and probative of a necessary element of the charged offense. It does not suffice simply to see if the evidence is capable of being fitted within an exception to the rule. Rather, a balancing test must be applied. The evidence of another similar crime must not only be relevant, it must also be reasonably necessary to the government's case, and it must be plain, clear, and conclusive, before its probative value will be held to outweigh its potential prejudicial effects.'" "`"Prejudicial" is used in this phrase to limit the introduction of probative evidence of prior misconduct only when it is unduly and unfairly prejudicial.' `Of course, "prejudice, in this context, means more than simply damage to the opponent's cause. A party's case is always damaged by evidence that the facts are contrary to his contention; but that cannot be ground for exclusion. What is meant here is an undue tendency to move the tribunal to decide on an improper basis, commonly, though not always, an emotional one."'"
718 So.2d at 128 (citations omitted). See also Rule 404(b), Ala. R. Evid.; Charles W. Gamble, McElroy's Alabama Evidence § 69.01 (5th ed. 1996).
 Intent and Motive
The prosecution argued, and the trial court found, that testimony regarding the events leading up to the murder of McClendon's first wife was admissible as *Page 944 
evidence of intent — an issue placed in dispute by McClendon's denial that he solicited Schwiening to kill his second wife and by Schwiening's testimony that he was uncertain whether McClendon was serious when he asked Schwiening if he would be interested in killing Yvonne. Dean Gamble notes:
 "If the accused is charged with a crime that requires a prerequisite intent, collateral crimes, acts or misconduct are admissible to show that the accused possessed the necessary intent. This rule is based upon the theory that, because the unintentional doing of an act is abnormal and unusual, the more a person does other acts similar to the act in question, the greater the likelihood that the act in question was not done inadvertently."
Gamble, § 69.01(5) (footnotes omitted).
Because intent was an element of the crime charged, and because intent was a genuine issue in this case, the collateral act evidence was admissible to show McClendon's intent. We agree with the trial court that the testimony regarding McClendon's actions preceding his first wife's murder was not precluded by the general rule regarding evidence of prior bad acts. See Averette v. State, 469 So.2d 1371, 1374 (Ala.Crim.App. 1985). Furthermore, this Court has often held that evidence of motive is always admissible. E.g., Ex parte Register, 680 So.2d 225, 226-27 (Ala. 1994). Therefore, evidence of Yvonne and McClendon's possible involvement in Joanne's murder was properly admitted, because it suggested a motive for McClendon's desire to have Yvonne eliminated, specifically, extrication from an unhappy marriage to a spouse who wanted a divorce and a portion of his retirement funds.
 Remoteness
McClendon also argues that the testimony should have been excluded because it was too remote to be relevant. He contends that Alabama's appellate courts have applied an unwritten 10-year rule, and that they have generally excluded evidence of collateral bad acts that occurred outside that time range. We disagree.
We note at the outset that otherwise admissible evidence might be rendered inadmissible if it is considered to be too remote. This determination, however, is a matter for the trial court's sound discretion. E.g., Perkins v. State, 580 So.2d 4, 7-9 (Ala.Crim.App. 1990). "Remoteness exists when the offered evidence arose so long ago that it no longer possesses a tendency in logic to make the fact for which it is offered more or less probable than it would be without the evidence." Gamble, supra § 21.01(2) (footnote omitted). We have held that remoteness is a relative concept; it depends on the facts of the case. We have also recognized that remoteness generally affects the weight and probative value of the evidence rather than its admissibility. Cooley v. State, 686 So.2d 546, 549-50 (Ala.Crim.App. 1996) (evidence of search warrant issued 11 years earlier was not too remote); Smitherman v. State, 33 Ala. App. 316, 318, 33 So.2d 396, 398
(1948) (quoted in Ex parte Register, 680 So.2d 225, 228 (Ala. 1994)).
Rule 609(b), Ala. R. Evid., provides that for impeachment purposes aconviction that is more than 10 years old generally is admissible unless the trial court determines "that the probative value supported by facts and circumstances substantially outweighs its prejudicial effect." Neither the Alabama Rules of Evidence nor Alabama caselaw sets a specific time limit for when a collateral act is considered too remote, other than a conviction for impeachment purposes. That determination has always been made on a case-by-case basis and has been left to the sound *Page 945 
discretion of the trial judge. The trial judge's determination of this issue will be reversed only when the judge has abused that discretion. There was no abuse of discretion here.
Admission of remote collateral acts has been upheld by this Court. For example, in Smith v. State, 745 So.2d 284 (Ala.Crim.App. 1998), a husband and wife were convicted of sexually abusing the wife's three children. The trial court permitted the husband's 36- and 38-year-old daughters to testify that their father had sexually abused them and that the sexual abuse had begun when they were each 12 years old. Over the husband's objections, this Court upheld the admission of the prior bad act testimony, even though the prior acts occurred as much as 20 years before the crimes for which he was charged. In Smith, we noted that remoteness alone does not render evidence of a prior bad act inadmissible, and that the better practice is to admit the remote evidence and let the jury determine its credibility and weight. Id. at 289 (quoting Cofer v.State, 440 So.2d 1116, 1118-19 (Ala.Crim.App.), rev'd in part on othergrounds, 440 So.2d 1121 (Ala. 1983)). In upholding the admission of the collateral act evidence, we further observed that the prior bad acts were similar to the acts of which the husband was accused.
The collateral acts here were obviously remote. However, the acts were strikingly similar to that for which McClendon was being tried. The evidence indicated that, while he was having an extramarital affair with the woman who was to become his second wife, and after his first wife had told him that she wanted a divorce, McClendon had several discussions with others regarding schemes to murder his first wife. In the present case, McClendon was accused of soliciting a third party to murder his second wife, who also had stated that she wanted a divorce, and there was evidence that McClendon was engaged in an extramarital affair. Thus, both victims were married to McClendon at the time the solicitations occurred; both had stated they wanted a divorce; and McClendon was romantically involved with another woman when the solicitations occurred. Thus, the collateral act evidence was relevant, and it remained relevant, regardless of the passage of time.
Certainly, Alabama cases have held evidence of collateral bad acts to be inadmissible based at least in part on the remoteness of the acts. For example, in Ex parte Cofer, 440 So.2d 1121, 1123-24 (Ala. 1983), the Alabama Supreme Court held that a prior rape, alleged to have occurred 10 years before the charged offense, was too remote to be admissible. However, the Court in Cofer noted that the prior rape was not evidence of identity, motive, or any other exception to the general exclusionary rule, which prohibits prior bad act evidence for the sole purpose of suggesting that the accused was more likely to be guilty of committing the crime for which he was being tried. In this case, the trial court determined, correctly, that the evidence was necessary to the State's case, and it was admitted to show motive and intent.
In Ex parte Tomlin, 548 So.2d 1341, 1343 (Ala. 1989), a drug possession case, the Alabama Supreme Court held that evidence of the defendant's two prior drug-related convictions was too remote to be relevant. The Court noted, however, that the evidence was admitted solely to establish the appellant's guilt in the later case, and its admission was improper. In McClendon's case, as noted above, the prior bad act evidence was admitted as an exception to the general rule excluding prior bad acts, i.e., to establish motive and intent. *Page 946 
In Rodgers v. State, 624 So.2d 682 (Ala.Crim.App. 1993), a conspiracy and attempted-murder case in which the defendant attempted to kill his wife for the proceeds of the insurance on her life, we held that evidence that, 17 or 18 years earlier the defendant had shot at and had choked his wife, was too remote to be admissible. As in Cofer and Tomlin, the evidence was determined to be irrelevant to show motive or intent. Again, McClendon's case is distinguishable, because the prior bad act evidence was necessary to the State's case, and because it was relevant to show motive and intent.
While the prior bad act evidence here is remote in time, we simply cannot hold that the trial court abused its discretion when it admitted the evidence in this case. The remoteness of the evidence affected its weight and probative value, but did not require its exclusion, particularly in light of the thorough instruction the trial court issued to the jury regarding the limited purpose for the testimony. Accordingly, we hold that the collateral act evidence was not so remote as to lose its relevancy.
 Probative Value Versus Prejudice
McClendon also argues that the evidence should have been excluded because its probative value was outweighed by its prejudicial effect. Rule 403, Ala. R. Evid., provides that even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Prejudice, in this context, means more than damage to the defendant's case; there must be an undue tendency to influence the jury's decision-making. E.g., Campbell v. State,718 So.2d 123, 128 (Ala.Crim.App. 1997) (and cases quoted therein). This decision, too, is a matter for the trial court's sound discretion, and will not be disturbed on appeal absent a clear abuse of that discretion.E.g., Ward v. State, [Ms. CR-98-0800, Feb. 2, 2000] ___ So.2d ___ (Ala.Crim.App. 2000). As noted above, the trial court correctly determined that evidence of McClendon's acts preceding the murder of his first wife was relevant to show intent and motive in this crime. We further note that the collateral act evidence was necessary to the State's case, because McClendon's intent when making the statement to Schwiening was the primary issue before the jury. Finally, we observe that the testimony from several witnesses, Onward Hollaway, Leonard Lee, Ronnie Hester, Johnny Ware, and Keith Norred, about numerous, similar highly probative collateral acts — solicitations for or comments about Yvonne's murder beginning in 1986 — lessened the danger of unfair prejudice associated with the introduction of evidence associated with McClendon's involvement in the solicitation of Joanne's murder.
Based on the foregoing, we find that the trial court did not abuse its discretion when it determined that the probative value of the evidence relating to Joanne's murder outweighed the danger of unfair prejudice. We find this particularly true in light of the thorough instruction the trial court gave to the jury.
 Burden of Proof
Finally, McClendon argues that the collateral act evidence was inadmissible, because, he says, the State did not prove beyond a reasonable doubt that he conspired to have his first wife murdered. McClendon misperceives the State's burden of proof in this instance. This Court has previously noted:
 "In Huddleston v. United States, 485 U.S. 681, 687, 108 S.Ct. 1496, 1500, *Page 947 99 L.Ed.2d 771 (1988), the United States Supreme Court `expressly declined to require a level of proof of at least a preponderance of the evidence before the trial court could allow evidence of an extrinsic act to go before the jury.' Ex parte Hinton, 548 So.2d [562] at 567 [(Ala. 1989)]. `Rather, "similar" acts evidence should be admitted if there is sufficient evidence to support a finding by the jury that the defendant committed the similar act.' Huddleston, 485 U.S. at 685, 108 S.Ct. at 1499."
Akin v. State, 698 So.2d 228, 235 (Ala.Crim.App. 1996).
The trial court determined, and we agree with its determination, that the State presented sufficient evidence to support a finding by the jury that McClendon "committed the similar act," that is, he solicited a third party to murder his first wife, while he was engaged in an extramarital affair. Therefore, the State satisfied the burden of proof as to the collateral act.
 Conclusion
Following a thorough review of the evidence, of the trial court's legal analysis, and of the relevant legal principles, we hold that the trial court did not abuse its discretion when it admitted testimony regarding McClendon's actions preceding his first wife's murder. The evidence was relevant and material; it was not so remote as to be irrelevant and therefore inadmissible; its probative value was not substantially outweighed by its potential prejudice, particularly because there was ample evidence of more recent conversations that could be considered solicitations to murder Yvonne; and it was supported by sufficient evidence. Furthermore, the trial court's timely, precise instruction to the jury that it limit its consideration of the collateral act evidence solely to determine motive and intent, further supports our conclusion in this case that the trial court did not abuse its discretion in admitting the evidence. McClendon is not entitled to any relief on this claim.
 II.
McClendon also argues that the evidence was insufficient to support his conviction for solicitation. Specifically, he claims that none of the witnesses testified that McClendon asked him to kill Yvonne, and that, if Allen Schwiening's testimony was eliminated from consideration, no one would believe that the statements McClendon made to others about funerals and "doing a job" for him indicated any attempt to solicit someone to murder his now-missing wife. We disagree.
We have often stated that, when reviewing a claim regarding the sufficiency of the evidence, we must view the evidence in the light most favorable to the State, and accord the State all reasonable inferences arising from the evidence. E.g., Living v. State,796 So.2d 1121 (Ala.Crim.App. 2000). We have further held that we will not reweigh the evidence or interfere with the jury's decisions based on conflicting evidence and questions of witness credibility.E.g., Houston v. State, 798 So.2d 704 (Ala.Crim.App. 2000).
Section 13A-4-1, Ala. Code 1975, provides:
 "(a) A person is guilty of criminal solicitation if, with the intent that another person engage in conduct constituting a crime, he solicits, requests, commands or importunes such other person to engage in such conduct.
 "A person may not be convicted of criminal solicitation upon the uncorroborated testimony of the person allegedly solicited, and there must be proof of circumstances corroborating both the solicitation and the defendant's intent." *Page 948 
We have held that, although corroboration of the solicitation and the intent are required, the corroborating evidence may be circumstantial.Thornton v. State, 570 So.2d 762, 769 (Ala.Crim.App. 1990). There was sufficient corroboration presented in this case. The testimony of Onward Holloway, Leonard Lee, Ronnie Hester, and Keith Norred, regarding McClendon's statements about his poor relationship with Yvonne and about "doing a job" related to Yvonne, corroborated McClendon's intent and the solicitation. Testimony from Cindy Smith and Patrice Melton regarding McClendon's actions preceding the murder of his first wife also provided corroborative evidence of intent. The actual solicitation was also corroborated, circumstantially, by James Siggers and Robbie Robinson, who witnessed Schwiening's interactions with McClendon on the day McClendon solicited Schwiening's assistance. Robinson also corroborated the fact that Schwiening made a hasty retreat from her residence after he had talked to McClendon.
The evidence, both direct and circumstantial, established beyond a reasonable doubt that McClendon solicited Allen Schwiening to murder his second wife, Yvonne. Based on our review of the evidence, in light of the relevant legal principles, we hold that the jury's verdict is amply supported by the evidence, and we will not disturb the jury's resolution of the issues.
For the foregoing reasons, the judgment of the Circuit Court of Chambers County is due to be affirmed.
AFFIRMED.
McMillan, P.J., and Baschab, Shaw, and Wise, JJ., concur.
[1] The prosecutor argued that Cindy Smith did not tell anyone about the conversations she had overheard because to do so would have implicated her mother in a murder-for-hire scheme.
[2] In his briefs to this Court, McClendon makes specific reference only to the testimony of Cindy Smith. However, he makes repeated general references to "evidence relating to the murder of Joanne McClendon." While it is unclear whether McClendon is now objecting only to the testimony of Cindy Smith, or whether he is also objecting to the testimony of Patrice Melton, we note that the analysis used to determine the admissibility of Smith's testimony would be the same as the analysis used to determine the admissibility of Melton's testimony about the events preceding the murder of McClendon's first wife.