931 So.2d 759 (2004)
Ex parte George MARTIN.
(In re George Martin
v.
State of Alabama).
1022040.
Supreme Court of Alabama.
December 10, 2004.
Rehearing Denied February 18, 2005.
*761 Al Pennington, Mobile, for petitioner.
William H. Pryor, Jr., and Troy King, attys. gen.; Nathan A. Forrester, deputy atty. gen.; and A. Vernon Barnett IV and Anne C. Adams, asst. attys. gen., for respondent.
LYONS, Justice.
George Martin, a former Alabama State Trooper, was convicted of the murder of his wife, Hammoleketh Martin. The murder was made capital because it was committed for pecuniary gain (§ 13A-5-40(a)(7), Ala.Code 1975). The jury, by a vote of 8-4, recommended that Martin be sentenced to life in prison without the possibility of parole. The trial court overrode the jury's recommendation and sentenced Martin to death. The Court of Criminal Appeals affirmed Martin's conviction and sentence. Martin v. State, 931 So.2d 736, 759 (Ala.Crim.App.2003). Martin petitioned this Court for a writ of certiorari; we granted the writ only as to two of the issues set forth in Martin's petition. We affirm the judgment of the Court of *762 Criminal Appeals in part and reverse it in part.

I. Facts and Procedural History
We quote from the trial court's written findings of fact, as set forth by the Court of Criminal Appeals:
"`On October 8, 1995, officers of the Mobile Police Department and firefighters from the Mobile Fire Department were called to the scene of a vehicle fire in the vicinity of Willis Road and Highway 90 in an isolated area of South Mobile County. They arrived on the scene at approximately 11:30 p.m.
"`Upon arriving at the scene, police and firefighters observed a 1991 Ford Escort burning and viewed what appeared to be charred human remains inside the vehicle. The medical examiner was summoned and testified that he observed the head of the victim lying on the driver's side and the rest of the remains situated on the right front seat. Due to the immense heat from the still smoldering vehicle and the absence of light, the remains were not removed until the following morning. The medical examiner testified that parts of the body were not intact. Both arms and shoulders had virtually fallen off the torso, and so the remains had to be removed in pieces. At autopsy, these remains weighed only approximately 24 pounds. The manner of death was determined to be homicide; the cause of death was determined to be body burns (100%) and smoke inhalation. Moreover, the victim was alive at the time the fire started in the car.
"`The investigation revealed that the fire was intentionally set. According to the evidence, the fire started in the right rear passenger compartment and spread forward. The minimal damage to the front of the vehicle precluded any conclusion that the impact of the car with a tree in the area could have started the fire; rather, the evidence was uncontroverted that the scene was consistent with a staged wreck.
"`A traffic homicide investigator from the Alabama Department of Public Safety testified that he examined the vehicle and the scene in question. He conducted speed calculations of a vehicle and analyzed the kind of force that would have been necessary to cause such a fire. He concluded that the fire was not an accident and the collision of the vehicle with a tree did not produce sufficient force to start the fire.
"`[Martin], when initially notified by officers of the Mobile Police Department that his car had been found with a body in it stated that he had last seen his wife at approximately 8:00 or 8:30 p.m. that evening. He stated she left the house without telling him where she was going and that he fell asleep watching a football game on television. He initially stated that he had awakened at approximately 1:00 or 1:30 in the morning and, after noticing that his wife was not home, decided to go look for her.
"`[The State] introduced evidence of several inconsistencies in [Martin's] various statements. Among the inconsistencies, were the time that he awoke to discover his wife missing, that the victim carried a gasoline can in her automobile with her because the gas gauge did not work, and that a BIC [brand] lighter found at the scene was used by his wife, the victim, as a flashlight because the dome light in her car did not work. The evidence also established that the defendant was less than honest when questioned about the existence of life insurance policies insuring the life of his wife, Hammoleketh Martin. Though the defendant acknowledged the existence of a *763 policy insuring his wife's life for $200,000, he lied when he stated there were no other policies. In particular, another policy insuring the life of Hammoleketh Martin for $150,000 was introduced into evidence and, according to the State's evidence, this amount was collectible only if Hammoleketh Martin died in a passenger vehicle.
"`The State also introduced evidence of a Traffic Accident Investigation Report prepared by [Martin] approximately one year prior to the death of his wife. The report involved a traffic accident in which an automobile left the road, hit a tree, and burst into flames. The State contended that the report of his incident, which was the defendant's version of what occurred, was strikingly similar to the occurrences of one year prior.
"`The State linked the evidence of the insurance proceeds with the purported financial difficulties of the defendant. According to the prosecution's testimony, [Martin's] financial condition had deteriorated to the point where he was approaching bankruptcy.'"
931 So.2d at 739-41 (footnote omitted).
We granted certiorari review to address Martin's contention regarding the admissibility of statements allegedly made by the victim days before her death and to address the procedure used by the trial court in overriding the jury's recommendation of life imprisonment without parole.

II. Admissibility of Hearsay Testimony

A. Victim's Statements to a Friend
The Court of Criminal Appeals upheld the trial court's ruling that allowed the State's witness, Pamela Carey, a friend of the victim's, to testify over Martin's objection as to certain statements the victim had made to Carey before her death. The basis of Martin's objection was that the statements were hearsay and that they did not fit within an exception to the general rule that hearsay is inadmissible. In making his objection to the testimony when Carey was on the stand, defense counsel stated, "for the record, the grounds of that objection is there's not a proper exception under 803[, Ala. R. Evid.,] to the hearsay rule. . . . It is impossible to lay the predicate . . . and it calls for opinion testimony."[1]
Carey testified that, a few days before the victim's death, Carey had a conversation with the victim in which the victim told Carey that if she did not hear from the victim in "three or four days," she was to "call [the victim's] mama and daddy and tell them he did it." Carey also testified that the victim said to her during that same conversation: "he might not do it, George loves me."
*764 The State argues that the statements were offered for the purpose of showing the victim's fear of Martin. In other words, according to the State, the testimony was not intended to prove the truth of the fact that Martin planned to kill the victim, but simply to show the victim's belief that he might do so. The State makes this argument by referring to the state-of-mind exception to the hearsay rule set forth in Rule 803(3), Ala. R. Evid.
We note that the statements attributed to the victim in this case are not expressions of a state of mind, as would be the case with statements such as, "I hate him" or "I am afraid." The first statement attributed to the victim consists entirely of an instruction as to what Carey should do should she not hear from the victim in three or four days after their conversation. From this instruction, one can only infer a state of mind. Therefore, under a literal reading of the state-of-mind exception contained in Rule 803(3), Ala. R. Evid., that exception does not apply to this particular statement. The other statement is the victim's observation that Martin might not kill her, because she believed that he loved her. This statement relates to Martin's state of mind, not the victim's. Consequently, Rule 803(3) is also inapplicable to the second statement.
While the state-of-mind exception of Rule 803(3) is not applicable to the statements in this case, it does not follow that these statements were inadmissible hearsay. Whether the two statements attributed to the victim are subject to a hearsay objection depends upon whether they fall within the definition of hearsay set forth in Rule 801(c), Ala. R. Evid: "`Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." If the victim's statements to Carey were offered to prove that Martin was indeed planning on harming or killing the victim, then they were offered for the truth of the matters asserted and are hearsay. If they were offered simply to show circumstances from which one might infer the victim's state of mind, then the statements were not offered for the truth of the matters asserted therein (that Martin might or might not kill the victim) and they therefore do not fit within the definition of hearsay.[2] Further, even if these statements were not offered for the truth of the matters asserted therein and are therefore not hearsay, we must determine whether the purpose for which they were offered is relevant to the case under Rule 401, Ala. R. Evid.
Rule 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Two potential bases exist for determining that the victim's statements were relevant. First, evidence of a person's fear of his or her spouse could arguably be probative evidence indicative of a bad marriage. In turn, evidence that the accused and the victim's marriage was "bad" could show a motive for murder. See, e.g., McClendon v. State, 813 So.2d 936, 944 (Ala.Crim.App. 2001) ("Therefore, evidence of Yvonne and *765 McClendon's possible involvement in Joanne's murder was properly admitted, because it suggested a motive for McClendon's desire to have Yvonne eliminated, specifically, extrication from an unhappy marriage to a spouse who wanted a divorce and a portion of his retirement funds."); Hellums v. State, 549 So.2d 611, 614 (Ala. Crim.App.1989) ("The testimony in question in the case at bar [where a witness testified that the defendant had threatened to kill a third party for `wrecking' his marriage] related to the marriage of the [defendant] and [the victim]. It tended to show a possible motive by the [defendant] to kill his wife, i.e., the appellant's `wrecked' marriage.").
We need not decide in this case whether a statement offered not for the truth of the matters asserted, but to suggest a state of mind indicative of fear, indicating that the accused and the victim were involved in a bad marriage, is admissible as nonhearsay under Rule 801(c) or as an exception to the hearsay rule under Rule 803(c). We also need not decide whether, if such a statement is admissible to show a bad marriage, the State impermissibly injected the bad-marriage issue into the case by its opening statement so as to make the fear of the victim-spouse relevant.[3] We do not answer these questions because a separate and independent basis exists for admitting the victim's statements.
Evidence of the victim's state of mind or, as here, facts from which one might infer a state of mind, can be relevant where a theory put forth by the defense opens the door to such evidence, thereby making the victim's state of mind relevant. While other jurisdictions are not entirely consistent,[4] many courts have allowed evidence of a victim's state of mind only in certain situations. See United States v. Brown, 490 F.2d 758, 767 (D.C.Cir.1973) (recognizing three categories of cases in which a homicide victim's fear is relevant: 1) where the defendant claims self-defense; 2) where the defendant claims the victim committed suicide; and 3) where the defendant admits some involvement in the crime, but claims that the death was the result of an accident); State v. Revelle, 957 S.W.2d 428, 432 (Mo.Ct.App.1997) ("Where an accused claims self-defense, the deceased's state of mind is relevant to the issue of which participant in the killing was the aggressor. Where a defendant concedes his or her presence and involvement in a victim's death but claims an accident or suicide caused the death, the deceased's statements as to fear of guns or similar state of mind are relevant to rebut these defenses." (citations omitted)); Bray v. Commonwealth, 68 S.W.3d 375, 381-82 (Ky.2002) ("[W]here a defendant did not claim self-defense, an accidental death, or suicide, such statements [of the victim's fear of the defendant] usually have `little *766 relevancy except toward providing a strong inference of appellant's intent, actions or culpability.'" (quoting Partin v. Commonwealth, 918 S.W.2d 219, 222 (Ky. 1996))); People v. Armendariz, 37 Cal.3d 573, 586, 693 P.2d 243, 251, 209 Cal.Rptr. 664, 672 (1984) ("This court has repeatedly held that a victim's out-of-court statements of fear of an accused are admissible . . . only when the victim's conduct in conformity with that fear is in dispute. Absent such dispute, the statements are irrelevant."); Hatcher v. State, 735 N.E.2d 1155, 1161 (Ind.2000) ("We have noted three situations where [a statement indicating a homicide victim's fear] is admissible: (1) to show the intent of the victim to act in a particular way, (2) when the defendant puts the victim's state of mind in issue, and (3) sometimes to explain physical injuries suffered by the victim. . . . We decline the State's invitation to extend this list to include the admissibility of a victim's state of mind to show the nature of the relationship between the victim and the defendant." (emphasis added)).
It is unnecessary for us to decide whether a statement offered not for the truth of the matters asserted, but to suggest a state of mind indicative of fear of a spouse and therefore indicative of a bad marriage, is admissible as nonhearsay under Rule 801(c) or as an exception to the hearsay rule under Rule 803(c). It is unnecessary because Martin suggested during his opening statement that the victim in this case might have committed suicide. Such a theory of defense puts in issue the victim's state of mind. Statements probative of the victim's fear of dying or of her will to live are inconsistent with any suicidal tendencies on her part and are therefore relevant. Carey testified that the victim told her that if she did not hear from the victim in "three or four days," to "call [the victim's] mama and daddy and tell them he did it." Such a state of mind, which was consistent with the possibility of her death being occasioned solely by a third party and not by her own hand, was relevant to rebuttal of the defense's suggestion that the victim may have been suicidal.[5] Therefore, the statement, from which a fact-finder could infer the victim's state of mind, was relevant to an issue in the case, and the statement was admissible under Rule 401, Ala. R. Evid.[6] Accordingly, the *767 trial court did not err in admitting the evidence over Martin's hearsay objection.

B. Trial Court's Failure to Give Limiting Instruction
While the victim's statements were admissible for a nonhearsay purpose (i.e., to contradict the argument that the victim was suicidal), the jury was not given a limiting instruction explaining the scope of that admissibility. Specifically, the jury was not instructed that it could consider the statements solely for their tendency to establish that the victim was not suicidal and that it could not consider the statements as proof that Martin in fact killed the victim. On proper objection, such an instruction would have been appropriate. Rule 105, Ala. R. Evid. ("When evidence which is admissible . . . for one purpose but not admissible . . . for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly.").
Martin's trial counsel did not request a limiting instruction. Moreover, trial counsel did not object to the admission of the statements on the ground that the evidence was simply inadmissible by reason of Rule 403, Ala. R. Evid., which permits the exclusion of otherwise admissible evidence when the probative value of the evidence is substantially outweighed by the danger of unfair prejudice.[7]

C. Plain Error
Under these circumstances, we cannot reverse the trial court's judgment unless the failure to give a limiting instruction or failure to object based on Rule 403 amounted to plain error that "has or probably has adversely affected the substantial rights of the petitioner. . . ." Rule 39(a)(2)(D), Ala. R.App. P. See also Ex parte Land, 678 So.2d 224, 232 (Ala.1996) ("As noted by the State, [the defendant] failed to object to [allegedly prejudicial comments of the prosecution during closing arguments] and, thus, failed to preserve for appellate review the issues he now raises. However, because this is a case where the death penalty has been imposed, this Court will . . . notice any `plain error,' regardless of whether an objection was made before the trial court.").
"`To rise to the level of plain error, the claimed error must not only seriously affect a defendant's "substantial rights," but it must also have an unfair prejudicial impact on the jury's deliberations.'" Ex parte Bryant, [Ms. 1990901, June 21, 2002] ___ So.2d ___, ___ (Ala.2002) (quoting Hyde v. State, 778 So.2d 199, 209 (Ala. Crim.App.1998)). In United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the United States Supreme Court, construing the federal plain-error rule, stated:
"The Rule authorizes the Courts of Appeals to correct only `particularly egregious errors,' United States v. Frady, 456 U.S. 152, 163 (1982), those errors that `seriously affect the fairness, integrity or public reputation of judicial proceedings,' United States v. Atkinson, 297 U.S. [157], at 160 [(1936)]. In other words, the plain-error exception to the contemporaneous-objection rule is to be `used sparingly, solely in those circumstances in which a miscarriage of *768 justice would otherwise result.' United States v. Frady, 456 U.S., at 163, n. 14."
See also Ex parte Hodges, 856 So.2d 936, 947-48 (Ala.2003) (recognizing that plain error exists only if failure to recognize the error would "seriously affect the fairness or integrity of the judicial proceedings," and that the plain-error doctrine is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result" (internal quotation marks omitted)).
In Ex parte Minor, 780 So.2d 796 (Ala. 2000), we held that it was plain error for the trial court to fail to give, sua sponte, limiting instructions to the jury regarding its use of evidence of the defendant's prior convictions. The defendant had not objected to the evidence and had not requested an instruction that the evidence was to be used solely for impeachment purposes and not as evidence of guilt. In finding plain error, we recognized the "presumptively prejudicial nature of evidence of a defendant's prior convictions." 780 So.2d at 804. In the instant case, we are not dealing with evidence of prior convictions and their corresponding "presumptively prejudicial nature." In any event, in Snyder v. State, 839 So.2d 482, 485 (Ala.2001), we limited the holding of Minor, stating, "each inquiry regarding the propriety of an instruction on the use of evidence of prior convictions presented for impeachment purposes must be determined on a case-by-case basis."
Because there were no eyewitnesses to the incident in this case, the majority of the State's evidence at trial was necessarily circumstantial. That evidence tended to prove that the fire that burned the victim's vehicle was not caused by the impact of the vehicle with the tree, but rather that it was intentionally set. There was also evidence indicating that the car had been positioned against the tree in such a way as to be consistent with a staged accident. The State also presented testimony that Martin did not show any emotion after he was confronted with the news of his wife's death and that there were inconsistencies in his story as to why he believed his wife left their house the night she died and as to his whereabouts on that night. Additionally, the State introduced testimony that tended to refute Martin's claim that, although when he was searching for the victim he had twice driven down a highway close to the scene of the incident, he had not seen the fire or any of the lights of the emergency vehicles present at the scene. Also, there was evidence contradicting Martin's claim that the victim sometimes traveled with a full can of gasoline in her car and that she sometimes used a BIC brand lighter as a flashlight because the dome light in her car did not function correctly. Indeed, there was evidence showing that the dome light in the victim's car was working a few days before her death. The State presented evidence indicating that an unburned floor mat from the burned car was recovered in Martin's garage. The evidence also showed that Martin purchased carpet cleaner on the night of the incident, although no bloodstains were found at Martin's residence. Further, the State presented evidence of Martin's allegedly dire financial status, along with evidence that the victim had over $300,000 in insurance covering her life, even though she was not employed at the time of her death. The State also presented evidence indicating that, during the investigation, Martin withheld information concerning the amount of the insurance on the victim's life.
The direct evidence of Martin's guilt includes the testimony of a fellow inmate in the jail cell in which Martin was held, who testified that Martin confessed to "subdu[ing]" the victim and "put[ting] her *769 in the car." Apparently, three other inmates allegedly confessed their crimes to this same informant, all within a few days. Martin testified in his own behalf and denied making a confession. The State also introduced the clothing Martin wore on the night the victim died. While that clothing carried traces of gasoline, Martin offered evidence indicating that the clothing had been mishandled after it was seized by investigators. The clothing was placed in a paper bag rather than in a metal can, which is the generally accepted procedure for storing evidence that may contain traces of flammable vapors. The bag containing the clothing was then stored overnight in the closed trunk of a police car, next to another paper bag containing gasoline-soaked newspapers. On cross-examination, the State's witnesses admitted that, because of the mishandling of the evidence, it was probable that the clothing had been cross-contaminated by the gasoline from the newspaper. The State also produced a witness who testified that, on his way to work the night the victim died, he saw a state trooper's car near the scene of the incident with its lights off. According to the witness, there was a black man in the driver's seat of the trooper car. George Martin, who is black, was an Alabama State Trooper at the time of his wife's death. Finally, the State introduced an accident report completed by Martin exactly one year before the night of the victim's death. That report described an accident involving a burned vehicle somewhat similar to the incident in which Martin's wife died.
After carefully reviewing the evidence presented at trial, we conclude that a miscarriage of justice that would cause a loss of confidence in the validity of judicial proceedings has not occurred. See Ex parte Hodges and Young, supra. Indeed, one portion of the statements in question tended to lessen the prejudicial impact of the rest of the testimony. Carey testified that the victim said, "[H]e might not do it, George loves me." Absent a limiting instruction, the jury had before it a statement that it could consider for the truth of the matter asserted therein, i.e., that Martin might not kill his wife because he loved her.[8] Therefore, under all the circumstances, the failure of the trial court to give a limiting instruction regarding the scope of the admissibility of the victim's statements to Carey did not constitute plain error.
Whether the failure of defense counsel to request a limiting instruction with respect to the previously discussed testimony by Carey or to object on the ground that the prejudicial effect of the victim's statements outweighed their probative value constituted ineffective assistance of counsel is not an issue before us. Nor do we address whether our determination of the absence of plain error forecloses a determination of the existence of the prejudice required under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), for a claim of ineffective assistance of counsel. See Taylor v. State, [Ms. CR-02-0706, Aug. 27, 2004] ___ So.2d ___ (Ala.Crim.App.2004).

III. Alabama's Statutory Sentencing Scheme and Apprendi
Martin contends that Alabama cases have too narrowly interpreted the United States Supreme Court's decisions in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). In Apprendi, *770 the United States Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490, 120 S.Ct. 2348. According to the Supreme Court's holding in Ring, Arizona's statutory sentencing scheme violated the rule set forth in Apprendi. In Ex parte Hodges, 856 So.2d 936 (Ala.2003), we explained the difference between Alabama's sentencing scheme and Arizona's:
"However, under Arizona's statutory scheme, unlike Alabama's, only the trial court heard the evidence submitted at the sentencing hearing. The trial court determined which aggravating circumstances and mitigating circumstances existed, weighed those circumstances, and sentenced Ring to death. The Supreme Court concluded that because `Arizona's enumerated aggravating factors operate as "the functional equivalent of an element of a greater offense,"' those factors must be found by a jury. 536 U.S. at 609, 122 S.Ct. at 2443 (quoting Apprendi, 530 U.S. at 494 n. 19, 120 S.Ct. 2348). Because the trial judge and not the jury made the factual findings required to sentence Ring to death, the Supreme Court reversed the judgment of the Supreme Court of Arizona."
856 So.2d at 943.
In Ex parte Waldrop, 859 So.2d 1181 (Ala.2002), the defendant was sentenced to death for a murder committed during a robbery. Because the existence of one of the aggravating circumstances (that the murder was committed during a robbery) was determined by the jury, we concluded that Ring and Apprendi did not require us to reverse the sentence. "Only one aggravating circumstance must exist in order to impose a sentence of death. Ala.Code 1975, § 13A-5-45(f). Thus . . . the jury, and not the trial judge, determined the existence of the `aggravating circumstance.. . .'" Waldrop, 859 So.2d at 1188.
In the instant case, as in Waldrop, the jury determined the existence of one of the aggravating circumstances (i.e., that the murder was committed for pecuniary gain). Although the trial court in overriding the jury's recommendation of a sentence of life imprisonment also considered the aggravating circumstance that the murder was "especially heinous, atrocious, or cruel" when compared to other capital murders, all that is required to impose a sentence of death is the existence of one aggravating circumstance, which in this case was determined by the jury. "Therefore, the findings in the jury's verdict alone exposed [Martin] to a range of punishment that had as its maximum the death penalty. This is all Ring and Apprendi require." Waldrop, 859 So.2d at 1188.

IV. Trial Court's Override of the Jury's Recommendation of Life Imprisonment Without Parole
In Ex parte Carroll, 852 So.2d 833, 836 (Ala.2002), we stated:
"[A jury's recommendation of life imprisonment without parole] is to be treated as a mitigating circumstance. The weight to be given that mitigating circumstance should depend upon the number of jurors recommending a sentence of life imprisonment without parole, and also upon the strength of the factual basis for such a recommendation in the form of information known to the jury, such as conflicting evidence concerning the identity of the `triggerman' or a recommendation of leniency by the victim's family; the jury's recommendation may be overridden based upon information known only to the trial court and not to the jury, when such information *771 can properly be used to undermine a mitigating circumstance."
Regarding the weight given the jury's recommendation of life imprisonment without parole, in its sentencing order the trial court stated:
"This Court, as is required by law, gives great deference to the jury's advisory verdict. This deference, however, does not preclude this Court from recognizing its duty to independently weigh the aggravating and mitigating circumstances as is required by law. The Court finds that the aggravating circumstances in this case far outweigh the mitigating circumstances and the punishment should be death."
This explanation fails to allow the defendant the benefit of having the jury's recommendation of life imprisonment without parole treated as a mitigating factor as required by Ex parte Carroll.[9] We reverse the judgment of the Court of Criminal Appeals and remand the case for that court to remand the case to the trial court for the entry of a new sentencing order.
As we held in Carroll, the weight to be given the jury's recommendation of life imprisonment without parole as a mitigating circumstance should depend upon the number of jurors recommending that sentence and also upon the strength of the factual basis for such a recommendation in the form of information known to the jury, such as the conflicting evidence concerning Martin's alleged confession to his fellow inmate and the probable cross-contamination of Martin's clothing. As we noted in Carroll, "the jury's recommendation may be overridden based upon information known only to the trial court and not to the jury, when such information can properly be used to undermine a mitigating circumstance." 852 So.2d at 836.

V. Conclusion
The testimony concerning the instructions given by the victim to her friend was relevant as to whether the victim had suicidal tendencies. Therefore, the victim's statements were admissible for a limited nonhearsay purpose. Trial counsel did not request a limiting instruction, and the failure of the trial court to give such an instruction sua sponte does not rise to the level of plain error. Finally, defense counsel's failure to object to the testimony in question, on the basis of Rule 403, Ala. R. Evid., at the time the statements were offered also did not rise to the level of plain error. Therefore, insofar as the judgment of the Court of Criminal Appeals affirmed the trial court's judgment on the basis that the victim's statements were properly admitted, it is affirmed.
Alabama's statutory sentencing scheme is not invalid in light of the United States Supreme Court's holding in Ring and Apprendi, supra. Finally, we must reverse the judgment of the Court of Criminal Appeals to allow the trial court to review its overriding of the jury's recommendation of life imprisonment without parole and its imposition of the death penalty in light of our opinion in Ex parte Carroll.
Martin filed a "Motion to Reconsider Grounds for Granting the Petition for Writ of Certiorari." In response, the State filed a "Motion to Strike Martin's Motion to Reconsider Grounds for Granting Cert. Petition." The State's motion is granted. See Rule 39(l), Ala. R.App. P. ("No application for rehearing shall be received in the Supreme Court if the petition for certiorari is denied, quashed, or stricken."). *772 Martin also filed a "Motion to Supplement Brief in Support of Petition for Writ of Certiorari." We granted that motion. We consider the arguments contained in the supplemental brief only in so far as they relate to the issues that were already before us, and we do not base any part of our ruling on those arguments.
MOTION TO STRIKE GRANTED; AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
NABERS, C.J., and HOUSTON, SEE, BROWN, HARWOOD, and WOODALL, JJ., concur.
JOHNSTONE, J., concurs in the rationale in part and concurs in the judgment.
STUART, J., concurs in the result.
JOHNSTONE, Justice (concurring in the rationale in part and concurring in the judgment).
But for one exception to the rationale, I concur in the main opinion. My exception, which I will define and explain, would not change the result.
I respectfully disagree with the conclusion of the main opinion that the deceased's out-of-court declarations to her friend, the witness Pamela Carey, tended to rebut the defendant's suggestion that the deceased may have committed suicide. Over the defendant's objections, Carey testified, in pertinent part:
"We had a conversation that day and she told me that her mom's name was Barbara Jackson, and she gave me the real phone number and address, and she told meshe told me that if I didn't hear from her in three or four days and if I hear something mysterious on the news or disappearing, missing, call her mama and daddy and tell them he did it.
". . . .
"We prayed and I told her don't say that. And then she said, he might not do it, he loves me, George loves me."
This testimony cannot be interpreted to mean that, in fact, George would kill the deceased and therefore she would not kill herself (the "truth of the matter asserted," Rule 801(c), Ala. R. Evid.) without violating Rule 802 and Rule 803(3), Ala. R. Evid. Further, because suicidal people commonly talk about their impending deaths, the deceased's out-of-court declarations on the topic of death cannot be fairly interpreted as meaning that she feared it or did not want it and therefore was not contemplating suicide. Rather, in my opinion, any relevancy of the deceased's out-of-court declarations not for "the truth of the matter asserted" would be their tendency to support the defendant's suggestion that the deceased may have committed suicide. Because of the other evidence tending to prove suicide described by the defendant in his opening statement and actually introduced by him in the trial, the deceased's out-of-court declarations to witness Carey can be interpreted as the deceased's effort to frame the defendant for the deceased's death before she committed suicide.
The defendant described in his opening statement and introduced at trial the testimony of the deceased's car insurance agent Tammy Hall about out-of-court declarations made to her by the deceased. According to witness Hall, the deceased asked Hall about existing and available coverages on the deceased's car insurance policy.
"Q. And what did you tell her?
"A. We discussed each coverage. I believe there were three coverages that she did not have and we went over each of those.
"Q. What were those three coverages?

*773 "A. Death and disability, loss of income, and loss of use.
"Q. You said death and disability. Might it have been death and dismemberment?
"A. Yes, sir.
"Q. And did she tell you what insurance she wanted?
"A. Yes, she did.
"Q. What did she tell you?
"A. She elected the death and dismemberment and loss of use.
"Q. Did she ask you about what vehicles it may cover?
"A. Yes, she did.
"Q. And what did you tell her?
"A. I told her that she only had to carry it on one vehicle to be covered in both.
"Q. Okay. And did you ask herdid she ask you anything about a fire?
"A. Yes, she did.
"Q. Tell the jury, if you would, please, ma'am, what she said to you about fire.
"A. She wanted to know if the death and dismemberment coverage would cover you if you were killed in a fire, if the vehicle caught fire.

"Q. And what did you tell her?
"A. I told her that it was my understanding that the policy stated it had to be the direct result of an automobile accident.
"Q. And did she ask you anything else about the degree of coverage?
"A. Yes, she did.
"Q. What did she ask?
"A. She asked if the vehicle just caught fire and you burned would it be covered.

"Q. And what did you tell her?
"A. I told her that I was not certain. According to the policy, it had to be the result of an automobile accident, but I would call the home office if she liked, and she said that was okay.
"Q. Did that inquiry cause you any particular concern?
"A. It was unusual.
"Q. How did it make you feel?
"A. Uncomfortable.
"Q. And why so?
"A. Normally when people ask, you know, what that coverage is and you tell them that it's coverage in the event that you're killed as the result of an automobile accident they do not ask any other questions.
"Q. Was the reference to fire what concerned you?
"A. Well
"Q. Let me rephrase that. Was the reference to fire what made you feel uncomfortable?
"A. Yes.
"Q. Did she choose a coverage?
"A. Yes, she did.
"Q. And did she ask about the payment?
"A. Yes, she did.
"Q. And what did you tell her?
"A. I told her that she would be billed for the additional premium.
"Q. Did she go ahead and procure the coverage at that time?

"A. Yes, she did.

"Q. And whathow did youwhat did she ask you to do?
"A. She signed the policy change.
"Q. And that was done at that time and the procedure was over?
"A. Yes."
(Emphasis added.) On cross-examination, witness Hall continued:

*774 "THE WITNESS: Okay. She asked if that was not what George wanted could she take it off.

"BY MR. DILL:
"Q. She asked youdo you know what she was referring to?
"A. The coverages that she had elected.
"Q. So she asked you if the ten thousand dollar death and disability life insurance that she was adding, she said if that's not what George wants, can I take it off?

"A. Yes, sir."
(Emphasis added.) Since a potential victim, expecting to be burned to death by her husband against her own wishes, would not likely accommodate his desires for insurance to cover the event, this testimony by insurance agent witness Hall, in the context of other evidence of the deceased's bizarre personality, supports the inference that the deceased was planning her own suicide and framing her husband, the defendant. The contested out-of-court declarations by the deceased to her friend, witness Carey, support the same inference.[10]
While the testimony of both witnesses State witness Carey and defense witness Hallwas potentially damaging to the defendant, he does not argue to us that he broached the subject of suicide and introduced the testimony of witness Hall to diminish the damage he expected from the contested testimony of witness Carey, which, but for the issue of suicide, would have been irrelevant in my opinion. While the State did not offer, and the trial court therefore probably did not admit, Carey's testimony for the purpose of proving that the deceased either did or did not commit suicide, this Court cannot ignore the tendency of this testimony to prove the suicide defense suggested by Martin in his opening statement and supported by evidence he later introduced. Moreover, although Martin did not exploit this tendency in his closing argument, the tendency nonetheless impairs his argument that Carey's contested testimony was prejudicial enough to require reversal. These considerations militate against a reversal of Martin's conviction on the ground of the admission of Carey's testimony to the deceased's out-of-court declarations.
NOTES
[1] In a pretrial motion, Martin requested that the trial court prohibit the State from offering any statements of the deceased that would constitute inadmissible hearsay. As one of the bases of that request, Martin stated that "any probative value of said evidence would be substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading of the jury." We are unable to find in the record a notation reflecting a ruling on that motion. During a bench conference just before Carey testified, defense counsel objected to the introduction of the statements of the victim. At that point, the defense did not object on the ground that the probative value of such statements was outweighed by the danger of unfair prejudice. See Rule 403, Ala. R. Evid. We conclude that Martin waived such a basis for objection. See Central Alabama Elec. Coop. v. Tapley, 546 So.2d 371, 382 (Ala.1989) ("`[U]nless the trial court's ruling on the motion in limine is absolute or unconditional, the ruling does not preserve the issue for [appellate review].'. . . If the ruling is not absolute, proper objections at trial are necessary to preserve the issue." (quoting Perry v. Brakefield, 534 So.2d 602, 606 (Ala.1988))).
[2] On appeal, Martin argues that the statements do not fall within the res gestae exception to the hearsay rule. Because we find that these statements, when offered only to show circumstances from which one might infer a state of mind and not to prove the truth of the matters asserted, do not fit within the definition of hearsay under Rule 801(c), no exception to the hearsay rule need be applied in order to justify their admission. We therefore do not reach the question whether the concept of res gestae, as an exception to the hearsay rule, survived the promulgation of the Alabama Rules of Evidence.
[3] See Willey v. State, 712 N.E.2d 434, 444 (Ind.1999) ("The State cannot bootstrap this evidence [the victim's fear of her husband] into admissibility by putting it in, forcing a denial, and then claiming it was put in issue by the defendant. In sum, because [the victim's] fear of [the defendant] was not relevant to any issue in the case and [the defendant] did not place her state of mind in issue, we hold that the trial court abused its discretion by allowing these witnesses to offer hearsay testimony regarding [the defendant's] threats and [the victim's] fear of him.").
[4] Some courts have simply declared that evidence of a victim's state of mind is admissible. See State v. Radabaugh, 93 Idaho 727, 731, 471 P.2d 582, 586 (1970) ("Evidence tending to show the mental state of the victim and ill-feeling or hostility between decedent and defendant is admissible."); State v. Alston, 341 N.C. 198, 230, 461 S.E.2d 687, 704 (1995) ("[A] murder victim's statements falling within the state of mind exception to the hearsay rule are highly relevant to show the status of the victim's relationship to the defendant.").
[5] Justice Johnstone's special writing urges that the statements are supportive of the theory that the victim's death was a suicide, when read in connection with subsequent evidence offered by Martin from the victim's insurance agent who testified that the victim expressed an interest in whether her insurance would cover death as a result of being burned in her automobile. Justice Johnstone's special writing concludes that "the deceased's out-of-court declarations to witness Carey can be interpreted as the deceased's effort to frame the defendant for the deceased's death before she committed suicide." 931 So.2d at 772. Of course, at the time the testimony of Pam Carey was admitted, the insurance agent had not testified; therefore, we cannot say that that specific consideration animated the trial court's ruling in admitting the evidence. We can safely assume that the State did not offer the statement to show the victim's suicidal intent. Justice Johnstone also expresses concern that "this case tests the limits of the doctrine that an appellate court will affirm the evidentiary ruling of a trial court if it is right for any reason supported by the record even if the parties did not argue the reason and the trial judge did not adopt it." 931 So.2d at 774 n. 10. That observation should be tempered by recognition that the alternative of reversal, based on an argument not made by Martin as to the effect of the suicide defense on the admissibility of the statements in question, must pass muster under a plain-error analysis.
[6] Justice Johnstone's special writing equates proof that the victim was not suicidal with proof that Martin committed the crime of murder. Such a rationale impermissibly restricts evidence of the victim's state of mind. The victim's statements to the effect of "he did it" or "he might not do it" are probative of the victim's desire to live regardless of whether the assertions contained in those statements were, in reality, true when they were made. That a limiting instruction might have been helpful is discussed infra.
[7] See note 1, supra. Additionally, as previously noted, in his petition for certiorari review, Martin argues only that the res gestae exception to the hearsay rule is inapplicable and that the statements are therefore inadmissible hearsay.
[8] As previously discussed at note 5, supra, Justice Johnstone's special writing urges that the victim's statements, when considered in light of the subsequent testimony of the victim's insurance agent, actually supported the theory that the victim's death was a suicide.
[9] We note that our decision in Carroll was released long after the trial court sentenced Martin to death. Therefore, the learned trial judge cannot be criticized for failing to apply Carroll in this case.
[10] Footnote 5 in the main opinion attacks the analysis in this special writing on the ground that "we cannot say that that specific consideration animated the trial court's ruling in admitting the [Carey] evidence." This lack of trial court animation seems immaterial, as we also cannot say that the theory advanced by the main opinion animated the trial court in its admission of the Carey evidence. Neither the prosecutor nor the trial judge nor the Court of Criminal Appeals nor even the Attorney General in his briefs to us even mentioned the suicide defense as a justification for the admission of the Carey evidence. Rather, the differing analyses to the effect that the suicide defense justifies the admission of the Carey evidence originate in the Justices on this Court, including me. Indeed, I am beginning to think this case tests the limits of the doctrine that an appellate court will affirm the evidentiary ruling of a trial court if it is right for any reason supported by the record even if the parties did not argue the reason and the trial judge did not adopt it.